# TANNER ET AL. *v.* UNITED STATES

No. 86–177.   Argued March 31, 1987—Decided June 22, 1987

108

O'CONNOR, J., delivered the opinion for a unanimous Court with respect to Parts III and IV and the opinion of the Court with respect to Parts I and II, in which REHNQUIST, C. J., and WHITE, POWELL, and SCALIA, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post,* p. 134.

*John A. DeVault III* argued the cause for petitioners. With him on the briefs were *Timothy J. Corrigan* and *David R. Best.*

*Richard J. Lazarus* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson,* and *Gloria C. Phares.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioners William Conover and Anthony Tanner were convicted of conspiring to defraud the United States in violation of 18 U. S. C. § 371, and of committing mail fraud in

violation of 18 U. S. C. § 1341. The United States Court of Appeals for the Eleventh Circuit affirmed the convictions. 772 F. 2d 765 (1985). Petitioners argue that the District Court erred in refusing to admit juror testimony at a post-verdict hearing on juror intoxication during the trial; and that the conspiracy count of the indictment failed to charge a crime against the United States. We affirm in part and remand.

I

Conover was the procurement manager at Seminole Electric Cooperative, Inc. (Seminole), a Florida corporation owned and operated by 11 rural electric distribution cooperatives. Seminole generates and transmits electrical energy to the cooperatives.

In 1979, Seminole borrowed over $1.1 billion from the Federal Financing Bank in order to construct a coal-fired power plant near Palatka, Florida. The loan was guaranteed by the Rural Electrification Administration (REA), a credit agency of the United States Department of Agriculture that assists rural electric organizations by providing loans, guaranteeing loans from other sources, and approving other security arrangements that allow the borrower to obtain financing. REA, A Brief History of the Rural Electrification and Telephone Programs (1985). The loan agreement between Seminole and the REA provided for federal supervision of the construction project. Under the contract, the REA could supervise the construction and equipment of the electric system, and inspect, examine, and test all work and materials relating to the construction project. App. 61–62. REA Bulletins and REA memoranda required Seminole to obtain REA approval before letting out certain contracts, and required certain bidding procedures to be used depending on the type of contract. *Id.*, at 83, 105–108.

Construction of the Palatka plant began in September 1979. To provide access to an area where a transmission line would be run, the plans called for the construction of a 51-

mile patrol road.   The road required materials that would support heavy trucks and resist flooding, and in March 1981, Conover was informed that Seminole's current construction contractor was having difficulty obtaining enough suitable fill material for the road.   The contractor indicated that it had not attempted to locate alternative fill materials, and that the contract price would have to be increased substantially in order for them to complete the road.   The contract was subsequently terminated.

Following the March meeting at which Conover was informed of the difficulty with the patrol road, Conover called a friend, Anthony R. Tanner.   Tanner owned a limerock mine, and the two discussed the possibility of using limerock and limerock overburden as an alternative fill material. At Conover's request, a Seminole engineer examined the material at Tanner's mine and determined that it would be suitable for the road.   Seminole acquired limerock overburden from Tanner on an interim basis so that road construction could continue while bids were solicited for the remainder of the project.   Seminole called for bids on a contract for provision of fill materials as well as a contract for building the road.   Both contracts were to be paid with loan money guaranteed by the REA, and the contract for building the road required the REA's approval.   The final specifications for the two contracts, which were prepared by Conover's procurement department, were favorable to Tanner's company in several respects.   Tanner was awarded both contracts on May 14, 1981.   The fill material contract paid approximately $1,041,800, and the road construction contract paid approximately $548,000.   App. 10.

Several problems developed after Tanner began working on the road.   There was a dispute as to whether Seminole or Tanner was required to maintain access roads leading to the patrol road.   Conover advised Seminole that the contract was ambiguous and that Seminole should pay for maintenance of the access road; ultimately Seminole did pay for the

access road. Later, the REA complained that the bond provided by Tanner was not from a bonding company approved by the Treasury Department. In two letters to another bonding company in July 1981, Conover represented the construction on the patrol road to be considerably more advanced than it was at that time. It was also discovered during the course of construction that limerock, which weakens when wet, could not be used in areas subject to flooding. For those areas Tanner's company provided and spread sand, at a higher price than the sand provided and spread by the first contractor. The patrol road was completed in October 1981.

At the time Conover called Tanner about using limerock as a fill material for Seminole's patrol road, Tanner and Conover were friends and had engaged in several business deals together. In January 1981 Conover had obtained a contract from Tanner to perform landscaping work and install a sprinkler system at a condominium complex owned by Tanner. In early March 1981, Tanner paid Conover $10,035, allegedly in partial payment for the landscaping work; eventually Conover received a total of $15,000 for the work. In May 1981 Conover purchased a condominium from Tanner, and Tanner loaned Conover $6,000 so that Conover could close on the condominium.

In June 1981, before the patrol road was finished, representatives of one of the members of the Seminole cooperative requested that Seminole end all business relations with Tanner. Seminole initiated an internal investigation, after which Seminole suspended and later demoted Conover for violation of the company's conflict of interest policies.

Federal authorities also investigated the situation, and in June 1983 Conover and Tanner were indicted. A 6-week trial resulted in a hung jury and a mistrial was declared. The two were subsequently reindicted; the first count alleged conspiracy to defraud the United States in violation of 18 U. S. C. § 371, and the second through fifth counts alleged

separate instances of mail fraud in violation of 18 U. S. C. § 1341. Conover was convicted on all counts; Tanner was convicted on all but count three.

The day before petitioners were scheduled to be sentenced, Tanner filed a motion, in which Conover subsequently joined, seeking continuance of the sentencing date, permission to interview jurors, an evidentiary hearing, and a new trial. According to an affidavit accompanying the motion, Tanner's attorney had received an unsolicited telephone call from one of the trial jurors, Vera Asbul. App. 246. Juror Asbul informed Tanner's attorney that several of the jurors consumed alcohol during the lunch breaks at various times throughout the trial, causing them to sleep through the afternoons. *Id.,* at 247. The District Court continued the sentencing date, ordered the parties to file memoranda, and heard argument on the motion to interview jurors. The District Court concluded that juror testimony on intoxication was inadmissible under Federal Rule of Evidence 606(b) to impeach the jury's verdict. The District Court invited petitioners to call any nonjuror witnesses, such as courtroom personnel, in support of the motion for new trial. Tanner's counsel took the stand and testified that he had observed one of the jurors "in a sort of giggly mood" at one point during the trial but did not bring this to anyone's attention at the time. *Id.,* at 170.

Earlier in the hearing the judge referred to a conversation between defense counsel and the judge during the trial on the possibility that jurors were sometimes falling asleep. During that extended exchange the judge twice advised counsel to immediately inform the court if they observed jurors being inattentive, and suggested measures the judge would take if he were so informed:

> "MR. MILBRATH [defense counsel]: But, in any event, I've noticed over a period of several days that a couple of jurors in particular have been taking long naps during the trial.

"THE COURT: Is that right.   Maybe I didn't notice because I was ——

"MR. MILBRATH: I imagine the Prosecutors have noticed that a time or two.

"THE COURT: What's your solution?

"MR. MILBRATH: Well, I just think a respectful comment from the Court that if any of them are getting drowsy, they just ask for a break or something might be helpful.

"THE COURT: Well, here's what I have done in the past—and, you have to do it very diplomatically, of course: I once said, I remember, 'I think we'll just let everybody stand up and stretch, it's getting a little sleepy in here,' I said, but that doesn't sound good in the record.

"I'm going to—not going to take on that responsibility. If any of you think you see that happening, ask for a bench conference and come up and tell me about it and I'll figure out what to do about it, and I won't mention who suggested it.

"MR. MILBRATH: All right.

"THE COURT: But, I'm not going to sit here and watch.   I'm—among other things, I'm not going to see—this is off the record.

"(Discussion had off the record.)

". . . [T]his is a new thing to this jury, and I don't know how interesting it is to them or not; some of them look like they're pretty interested.

.          .          .          .          .

"And, as I say, if you don't think they are, come up and let me know and I'll figure how—either have a recess or—which is more than likely what I would do." Tr. 12–100–12–101.

As the judge observed during the hearing, despite the above admonitions counsel did not bring the matter to the court again.   App. 147.

The judge also observed that in the past courtroom employees had alerted him to problems with the jury. "Nothing was brought to my attention in this case about anyone appearing to be intoxicated," the judge stated, adding, "I saw nothing that suggested they were." *Id.*, at 172.

Following the hearing the District Court filed an order stating that "[o]n the basis of the admissible evidence offered I specifically find that the motions for leave to interview jurors or for an evidentiary hearing at which jurors would be witnesses is not required or appropriate." The District Court also denied the motion for new trial. *Id.*, at 181–182.

While the appeal of this case was pending before the Eleventh Circuit, petitioners filed another new trial motion based on additional evidence of jury misconduct. In another affidavit, Tanner's attorney stated that he received an unsolicited visit at his residence from a second juror, Daniel Hardy. *Id.*, at 241. Despite the fact that the District Court had denied petitioners' motion for leave to interview jurors, two days after Hardy's visit Tanner's attorney arranged for Hardy to be interviewed by two private investigators. *Id.*, at 242. The interview was transcribed, sworn to by the juror, and attached to the new trial motion. In the interview Hardy stated that he "felt like . . . the jury was on one big party." *Id.*, at 209. Hardy indicated that seven of the jurors drank alcohol during the noon recess. Four jurors, including Hardy, consumed between them "a pitcher to three pitchers" of beer during various recesses. *Id.*, at 212. Of the three other jurors who were alleged to have consumed alcohol, Hardy stated that on several occasions he observed two jurors having one or two mixed drinks during the lunch recess, and one other juror, who was also the foreperson, having a liter of wine on each of three occasions. *Id.*, at 213–215. Juror Hardy also stated that he and three other jurors smoked marijuana quite regularly during the trial. *Id.*, at 216–223. Moreover, Hardy stated that during the trial he observed one juror ingest cocaine five times and an-

other juror ingest cocaine two or three times. *Id.*, at 227. One juror sold a quarter pound of marijuana to another juror during the trial, and took marijuana, cocaine, and drug paraphernalia into the courthouse. *Id.*, at 234–235. Hardy noted that some of the jurors were falling asleep during the trial, and that one of the jurors described himself to Hardy as "flying." *Id.*, at 229. Hardy stated that before he visited Tanner's attorney at his residence, no one had contacted him concerning the jury's conduct, and Hardy had not been offered anything in return for his statement. *Id.*, at 232. Hardy said that he came forward "to clear my conscience" and "[b]ecause I felt . . . that the people on the jury didn't have no business being on the jury. I felt . . . that Mr. Tanner should have a better opportunity to get somebody that would review the facts right." *Id.*, at 231–232.

The District Court, stating that the motions "contain supplemental allegations which differ quantitatively but not qualitatively from those in the April motions," *id.*, at 256, denied petitioners' motion for a new trial.

The Court of Appeals for the Eleventh Circuit affirmed. 772 F. 2d 765 (1985). We granted certiorari, 479 U. S. 929 (1986), to consider whether the District Court was required to hold an evidentiary hearing, including juror testimony, on juror alcohol and drug use during the trial, and to consider whether petitioners' actions constituted a conspiracy to defraud the United States within the meaning of 18 U. S. C. § 371.

## II

Petitioners argue that the District Court erred in not ordering an additional evidentiary hearing at which jurors would testify concerning drug and alcohol use during the trial. Petitioners assert that, contrary to the holdings of the District Court and the Court of Appeals, juror testimony on ingestion of drugs or alcohol during the trial is not barred by Federal Rule of Evidence 606(b). Moreover, petitioners argue that whether or not authorized by Rule 606(b), an evi-

dentiary hearing including juror testimony on drug and alcohol use is compelled by their Sixth Amendment right to trial by a competent jury.

By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict. See 8 J. Wigmore, Evidence § 2352, pp. 696–697 (J. McNaughton rev. ed. 1961) (common-law rule, originating from 1785 opinion of Lord Mansfield, "came to receive in the United States an adherence almost unquestioned").

Exceptions to the common-law rule were recognized only in situations in which an "extraneous influence," *Mattox* v. *United States*, 146 U. S. 140, 149 (1892), was alleged to have affected the jury. In *Mattox*, this Court held admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence. The Court allowed juror testimony on influence by outsiders in *Parker* v. *Gladden*, 385 U. S. 363, 365 (1966) (bailiff's comments on defendant), and *Remmer* v. *United States*, 347 U. S. 227, 228–230 (1954) (bribe offered to juror). See also *Smith* v. *Phillips*, 455 U. S. 209 (1982) (juror in criminal trial had submitted an application for employment at the District Attorney's office). In situations that did not fall into this exception for external influence, however, the Court adhered to the common-law rule against admitting juror testimony to impeach a verdict. *McDonald* v. *Pless*, 238 U. S. 264 (1915); *Hyde* v. *United States*, 225 U. S. 347, 384 (1912).

Lower courts used this external/internal distinction to identify those instances in which juror testimony impeaching a verdict would be admissible. The distinction was not based on whether the juror was literally inside or outside the jury room when the alleged irregularity took place; rather, the distinction was based on the nature of the allegation. Clearly a rigid distinction based only on whether the event took place inside or outside the jury room would have been

quite unhelpful. For example, under a distinction based on location a juror could not testify concerning a newspaper read inside the jury room. Instead, of course, this has been considered an external influence about which juror testimony is admissible. See *United States* v. *Thomas*, 463 F. 2d 1061 (CA7 1972). Similarly, under a rigid locational distinction jurors could be regularly required to testify after the verdict as to whether they heard and comprehended the judge's instructions, since the charge to the jury takes place outside the jury room. Courts wisely have treated allegations of a juror's inability to hear or comprehend at trial as an internal matter. See *Government of the Virgin Islands* v. *Nicholas*, 759 F. 2d 1073 (CA3 1985); *Davis* v. *United States*, 47 F. 2d 1071 (CA5 1931) (rejecting juror testimony impeaching verdict, including testimony that jurors had not heard a particular instruction of the court).

Most significant for the present case, however, is the fact that lower federal courts treated allegations of the physical or mental incompetence of a juror as "internal" rather than "external" matters. In *United States* v. *Dioguardi*, 492 F. 2d 70 (CA2 1974), the defendant Dioguardi received a letter from one of the jurors soon after the trial in which the juror explained that she had "eyes and ears that . . . see things before [they] happen," but that her eyes "are only partly open" because "a curse was put upon them some years ago." *Id.*, at 75. Armed with this letter and the opinions of seven psychiatrists that the letter suggested that the juror was suffering from a psychological disorder, Dioguardi sought a new trial or in the alternative an evidentiary hearing on the juror's competence. The District Court denied the motion and the Court of Appeals affirmed. The Court of Appeals noted "[t]he strong policy against any post-verdict inquiry into a juror's state of mind," *id.*, at 79, and observed:

> "The quickness with which jury findings will be set aside when there is proof of tampering or *external* influence, . . . parallel the reluctance of courts to inquire into jury

deliberations when a verdict is valid on its face. . . . Such exceptions support rather than undermine the rationale of the rule that possible *internal* abnormalities in a jury will not be inquired into except 'in the gravest and most important cases.' " *Id.*, at 79, n. 12, quoting *McDonald* v. *Pless, supra*, at 269 (emphasis in original).

The Court of Appeals concluded that when faced with allegations that a juror was mentally incompetent, "courts have refused to set aside a verdict, or even to make further inquiry, unless there be proof of an adjudication of insanity or mental incompetence closely in advance . . . of jury service," or proof of "a closely contemporaneous and independent posttrial adjudication of incompetency." 492 F. 2d, at 80. See also *Sullivan* v. *Fogg*, 613 F. 2d 465, 467 (CA2 1980) (allegation of juror insanity is internal consideration); *United States* v. *Allen*, 588 F. 2d 1100, 1106, n. 12 (CA5 1979) (noting "specific reluctance to probe the minds of jurors once they have deliberated their verdict"); *United States* v. *Pellegrini*, 441 F. Supp. 1367 (ED Pa. 1977), aff'd, 586 F. 2d 836 (CA3), cert. denied, 439 U. S. 1050 (1978) (whether juror sufficiently understood English language was not a question of "extraneous influence"). This line of federal decisions was reviewed in *Government of the Virgin Islands* v. *Nicholas, supra*, in which the Court of Appeals concluded that a juror's allegation that a hearing impairment interfered with his understanding of the evidence at trial was not a matter of "external influence." *Id.*, at 1079.

Substantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict. As early as 1915 this Court explained the necessity of shielding jury deliberations from public scrutiny:

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering some-

thing which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald* v. *Pless*, 238 U. S., at 267–268. See also *Mattox* v. *United States*, 146 U. S. 140 (1892).

The Court's holdings requiring an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process. See *Smith* v. *Phillips*, 455 U. S. 209 (1982) (juror in criminal trial had submitted an application for employment at the District Attorney's office); *Remmer* v. *United States*, 347 U. S. 227 (1954) (juror reported attempted bribe during trial and was subjected to investigation). The Court's statement in *Remmer* that "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions," *id.*, at 229, could also be applied to the inquiry petitioners seek to make into the internal processes of the jury.

There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. See, *e. g.*, *Government of the Virgin Islands* v. *Nicholas, supra*, at 1081 (one year and eight months after verdict rendered, juror alleged that hearing difficulties affected his understanding of the evidence). Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict,

and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct. See Note, Public Disclosures of Jury Deliberations, 96 Harv. L. Rev. 886, 888–892 (1983).

Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences. See *Government of the Virgin Islands* v. *Gereau*, 523 F. 2d 140, 149, n. 22 (CA3 1975); S. Rep. No. 93–1277, p. 13 (1974) (observing that Rule 606(b) "embodied long-accepted Federal law").

Rule 606(b) states:

> "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."

Petitioners have presented no argument that Rule 606(b) is inapplicable to the juror affidavits and the further inquiry they sought in this case, and, in fact, there appears to be virtually no support for such a proposition. See 3 D. Louisell & C. Mueller, Federal Evidence § 287, pp. 121–125 (1979) (under Rule 606(b), "proof to the following effects is excludable . . . : . . . that one or more jurors was inattentive during trial or deliberations, sleeping or thinking about other matters"); cf. Note, Impeachment of Verdicts by Ju-

rors—Rule of Evidence 606(b), 4 Wm. Mitchell L. Rev. 417, 430–431, and n. 88 (1978) (observing that under Rule 606(b), "juror testimony as to . . . juror intoxication probably will be inadmissible"; note author suggests that "[o]ne possibility is for the courts to determine that certain acts, such as a juror becoming intoxicated outside the jury room, simply are not within the rule," but cites no authority in support of the suggestion). Rather, petitioners argue that substance abuse constitutes an improper "outside influence" about which jurors may testify under Rule 606(b). In our view the language of the Rule cannot easily be stretched to cover this circumstance. However severe their effect and improper their use, drugs or alcohol voluntarily ingested by a juror seems no more an "outside influence" than a virus, poorly prepared food, or a lack of sleep.

In any case, whatever ambiguity might linger in the language of Rule 606(b) as applied to juror intoxication is resolved by the legislative history of the Rule. In 1972, following criticism of a proposed rule that would have allowed considerably broader use of juror testimony to impeach verdicts, the Advisory Committee drafted the present version of Rule 606(b). Compare 51 F. R. D. 315, 387 (1971) with 56 F. R. D. 183, 265 (1972); see 117 Cong. Rec. 33642, 33645 (1971) (letter from Sen. McClellan to Advisory Committee criticizing earlier proposal); *id.*, at 33655 (letter from Department of Justice to Advisory Committee criticizing earlier proposal and arguing that "[s]trong policy considerations continue to support the rule that jurors should not be permitted to testify about what occurred during the course of their deliberations"). This Court adopted the present version of Rule 606(b) and transmitted it to Congress.

The House Judiciary Committee described the effect of the version of Rule 606(b) transmitted by the Court as follows:

"As proposed by the Court, Rule 606(b) limited testimony by a juror in the course of an inquiry into the validity of a verdict or indictment. He could testify as to the

influence of extraneous prejudicial information brought to the jury's attention (e. g. a radio newscast or a newspaper account) or an outside influence which improperly had been brought to bear upon a juror (e. g. a threat to the safety of a member of his family), but he could not testify as to other irregularities which occurred in the jury room. Under this formulation a quotient verdict could not be attacked through the testimony of juror, *nor could a juror testify to the drunken condition of a fellow juror which so disabled him that he could not participate in the jury's deliberations.*" H. R. Rep. No. 93–650, pp. 9–10 (1973) (emphasis supplied).

The House Judiciary Committee, persuaded that the better practice was to allow juror testimony on any "objective juror misconduct," amended the Rule so as to comport with the more expansive versions proposed by the Advisory Committee in earlier drafts,* and the House passed this amended version.

The Senate Judiciary Committee did not voice any disagreement with the House's interpretation of the Rule proposed by the Court, or the version passed by the House. Indeed, the Senate Report described the House version as "considerably broader" than the version proposed by the Court, and noted that the House version "would permit the impeachment of verdicts by inquiry into, not the mental processes of the jurors, but what happened in terms of conduct in the jury room." S. Rep. No. 93–1277, p. 13 (1974). With

---

*The House version, which adopted the earlier Advisory Committee proposal, read as follows:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes." H. R. 5463, 93d Cong., 2d Sess. (1974).

this understanding of the differences between the two versions of Rule 606(b)—an understanding identical to that of the House—the Senate decided to reject the broader House version and adopt the narrower version approved by the Court. The Senate Report explained:

"[The House version's] extension of the ability to impeach a verdict is felt to be unwarranted and ill-advised.

"The rule passed by the House embodies a suggestion by the Advisory Committee of the Judicial Conference that is considerably broader than the final version adopted by the Supreme Court, which embodied long-accepted Federal law. Although forbidding the impeachment of verdicts by inquiry into the jurors' mental processes, it deletes from the Supreme Court version the proscription against testimony 'as to any matter or statement occurring during the course of the jury's deliberations.' This deletion would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions or that some of the jurors did not take part in deliberations.

"Permitting an individual to attack a jury verdict based upon the jury's internal deliberations has long been recognized as unwise by the Supreme Court.

. . . . .

"As it stands then, the rule would permit the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated ex-jurors.

"Public policy requires a finality to litigation. And common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the in-

terest of protecting the jury system and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors." *Id.*, at 13–14.

The Conference Committee Report reaffirms Congress' understanding of the differences between the House and Senate versions of Rule 606(b): "[T]he House bill allows a juror to testify about objective matters occurring during the jury's deliberation, such as the misconduct of another. juror or the reaching of a quotient verdict. The Senate bill does not permit juror testimony about any matter or statement occurring during the course of the jury's deliberations." H. R. Conf. Rep. No. 93–1597, p. 8 (1974). The Conference Committee adopted, and Congress enacted, the Senate version of Rule 606(b).

Thus, the legislative history demonstrates with uncommon clarity that Congress specifically understood, considered, and rejected a version of Rule 606(b) that would have allowed jurors to testify on juror conduct during deliberations, including juror intoxication. This legislative history provides strong support for the most reasonable reading of the language of Rule 606(b)—that juror intoxication is not an "outside influence" about which jurors may testify to impeach their verdict.

Finally, even if Rule 606(b) is interpreted to retain the common-law exception allowing postverdict inquiry of juror incompetence in cases of "substantial if not wholly conclusive evidence of incompetency," *Dioguardi*, 492 F. 2d, at 80, the showing made by petitioners falls far short of this standard. The affidavits and testimony presented in support of the first new trial motion suggested, at worst, that several of the jurors fell asleep at times during the afternoons. The District Court Judge appropriately considered the fact that he had "an unobstructed view" of the jury, and did not see any juror sleeping. App. 147–149, 167–168; see *Government of the Virgin Islands* v. *Nicholas*, 759 F. 2d, at 1077 ("[I]t was appropriate for the trial judge to draw upon his personal

knowledge and recollection in considering the factual allegations . . . that related to events that occurred in his presence"). The juror affidavit submitted in support of the second new trial motion was obtained in clear violation of the District Court's order and the court's local rule against juror interviews, MD Fla. Rule 2.04(c); on this basis alone the District Court would have been acting within its discretion in disregarding the affidavit. In any case, although the affidavit of juror Hardy describes more dramatic instances of misconduct, Hardy's allegations of *incompetence* are meager. Hardy stated that the alcohol consumption he engaged in with three other jurors did not leave any of them intoxicated. App. to Pet. for Cert. 47 ("I told [the prosecutor] that we would just go out and get us a pitcher of beer and drink it, but as far as us being drunk, no we wasn't"). The only allegations concerning the jurors' ability to properly consider the evidence were Hardy's observations that some jurors were "falling asleep all the time during the trial," and that his own reasoning ability was affected on one day of the trial. App. to Pet. for Cert. 46, 55. These allegations would not suffice to bring this case under the common-law exception allowing postverdict inquiry when an extremely strong showing of incompetency has been made.

Petitioners also argue that the refusal to hold an additional evidentiary hearing at which jurors would testify as to their conduct "violates the sixth amendment's guarantee to a fair trial before an impartial and *competent* jury." Brief for Petitioners 34 (emphasis in original).

This Court has recognized that a defendant has a right to "a tribunal both impartial and mentally competent to afford a hearing." *Jordan* v. *Massachusetts,* 225 U. S. 167, 176 (1912). In this case the District Court held an evidentiary hearing in response to petitioners' first new trial motion at which the judge invited petitioners to introduce any admissible evidence in support of their allegations. At issue in this case is whether the Constitution compelled the District

Court to hold an additional evidentiary hearing including one particular kind of evidence inadmissible under the Federal Rules.

As described above, long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry. Petitioners' Sixth Amendment interests in an unimpaired jury, on the other hand, are protected by several aspects of the trial process. The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire*. Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. See *United States* v. *Provenzano*, 620 F. 2d 985, 996–997 (CA3 1980) (marshal discovered sequestered juror smoking marijuana during early morning hours). Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict. See *Lee* v. *United States*, 454 A. 2d 770 (DC App. 1982), cert. denied *sub nom. McIlwain* v. *United States*, 464 U. S. 972 (1983) (on second day of deliberations, jurors sent judge a note suggesting that foreperson was incapacitated). Finally, after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct. See *United States* v. *Taliaferro*, 558 F. 2d 724, 725–726 (CA4 1977) (court considered records of club where jurors dined, and testimony of marshal who accompanied jurors, to determine whether jurors were intoxicated during deliberations). Indeed, in this case the District Court held an evidentiary hearing giving petitioners ample opportunity to produce nonjuror evidence supporting their allegations.

In light of these other sources of protection of petitioners' right to a competent jury, we conclude that the District Court did not err in deciding, based on the inadmissibility of juror testimony and the clear insufficiency of the nonjuror evidence offered by petitioners, that an additional postverdict evidentiary hearing was unnecessary.

## III

Title 18 U. S. C. § 371 provides, in relevant part:

> "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Section 371 is the descendent of and bears a strong resemblance to conspiracy laws that have been in the federal statute books since 1867. See Act of Mar. 2, 1867, ch. 169, § 30, 14 Stat. 484 (prohibiting conspiracy to "defraud the United States in any manner whatever"). Neither the original 1867 provision nor its subsequent reincarnations were accompanied by any particularly illuminating legislative history. This case has been preceded, however, by decisions of this Court interpreting the scope of the phrase "to defraud . . . in any manner or for any purpose." In those cases we have stated repeatedly that the fraud covered by the statute "reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *Dennis* v. *United States*, 384 U. S. 855, 861 (1966), quoting *Haas* v. *Henkel*, 216 U. S. 462, 479 (1910); see also *Glasser* v. *United States*, 315 U. S. 60, 66 (1942); *Hammerschmidt* v. *United States*, 265 U. S. 182, 188 (1924). We do not reconsider that aspect of the scope of § 371 in this case. Therefore, if petitioners' actions constituted a conspiracy to impair the functioning of the REA, no other form of injury to the Federal Government need be established for the conspiracy to fall under § 371.

The indictment against petitioners charged them with having conspired "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Rural Electrification Administration in its administration

and enforcement of its guaranteed loan program." App. 5. Petitioners argue that if the evidence adduced at trial established a conspiracy to defraud, then the target of that conspiracy was Seminole Electric, and a conspiracy to defraud a private corporation receiving financial assistance from the Federal Government does not constitute a conspiracy to defraud the United States.

The Government sets out two arguments in response to petitioners' challenge to the § 371 convictions. The first, which we accept, is that a conspiracy to defraud the United States may be effected by the use of third parties. The Government's second argument asserts that Seminole, as the recipient of federal financial assistance and the subject of federal supervision, may itself be treated as "the United States" for purposes of § 371. This second argument must be rejected.

The Government observes, correctly, that under the common law a fraud may be established when the defendant has made use of a third party to reach the target of the fraud. 2 H. Brill, Cyclopedia of Criminal Law § 1244, p. 1892 (1923). The Government also correctly observes that the broad language of § 371, covering conspiracies to defraud "in any manner for any purpose," puts no limits based on the *method* used to defraud the United States. A method that makes uses of innocent individuals or businesses to reach and defraud the United States is not for that reason beyond the scope of § 371. In two cases interpreting the False Claims Act, which reaches "[e]very person who makes or causes to be made, or presents or causes to be presented" a false claim against the United States, Rev. Stat. § 5438, we recognized that the fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the Act. *United States* v. *Bornstein,* 423 U. S. 303, 309 (1976); *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 541–545 (1943).

The Government's principal argument for affirmance of petitioners' § 371 convictions, however, is a great deal broader

than the proposition stated above. The Government argues that, because Seminole received financial assistance and some supervision from the United States, a conspiracy to defraud *Seminole* is *itself* a conspiracy "to defraud the United States."

The conspiracies criminalized by § 371 are defined not only by the nature of the injury intended by the conspiracy, and the method used to effectuate the conspiracy, but also—and most importantly—by the *target* of the conspiracy. Section 371 covers conspiracies to defraud "the United States or any agency thereof," a phrase that the Government concedes fails to describe Seminole Electric. Tr. of Oral Arg. 26 ("We do not say they are federal agents"). The Government suggests, however, that Seminole served as an intermediary performing official functions on behalf of the Federal Government, and on this basis a conspiracy to defraud Seminole may constitute a conspiracy to defraud the United States under § 371.

The Government suggests that this position is supported by the Court's reasoning in *Dixson* v. *United States,* 465 U. S. 482 (1984), a decision involving the scope of the federal bribery statute, 18 U. S. C. § 201(a). Far from supporting the Government's position in this case, the reasoning of the Court in *Dixson* illustrates why the argument is untenable. For the purpose of § 201's provisions pertaining to bribery of public officials and witnesses, § 201(a) defined "public official" to include "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof . . . in any official function, under or by authority of any such department, agency, or branch of Government." The question presented in *Dixson* was whether officers of a private, nonprofit corporation administering the expenditure of federal community development block grants were "public officials" under § 201(a). Although the "on behalf of" language in § 201(a) was open to an interpretation that covered the defendants in that case, it was not unambiguously so. Therefore, the Court found

§ 201(a) applicable to the defendants only after it concluded that such an interpretation was supported by the section's legislative history. See *Dixson*, 465 U. S., at 491–496. "If the legislative history fail[ed] to clarify the statutory language," the Court observed, "our rule of lenity would compel us to construe the statute in favor of petitioners, as criminal defendants in these cases." *Id.*, at 491; see *Rewis* v. *United States*, 401 U. S. 808, 812 (1971).

Unlike the interpretation of the federal bribery statute adopted by the Court in *Dixson*, the interpretation of § 371 proposed by the Government in this case has not even an arguable basis in the plain language of § 371. In *Dixson* the Court construed § 201(a)'s reference to those acting "on behalf of the United States." Rather than seeking a particular interpretation of ambiguous statutory language, the Government, in arguing that § 371 covers conspiracies to defraud those acting on behalf of the United States, asks this Court to expand the reach of a criminal provision by reading new language into it. This we cannot do.

Moreover, even if the Government's interpretation of § 371 could be pegged to some language in that section, the Government has presented us with nothing to overcome our rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States, supra*, at 812. The Government has wrested no aid from § 371's stingy legislative history. Neither has the Government suggested much to commend its interpretation in terms of clarity of application. Petitioners assert that the Government's logic would require any conspiracy to defraud someone who receives federal assistance to fall within § 371. The Government replies that "there must be substantial ongoing federal supervision of the defrauded intermediary or delegation of a distinctly federal function to that intermediary to render a fraud upon the intermediary a fraud upon the 'United States.'" Brief for United States 25–26. Yet the facts of this case demonstrate the difficulty of ascertaining

how much federal supervision should be considered "substantial." The Government emphasizes the supervisory powers granted the REA in the loan agreement; petitioners argue that the restrictions placed by the REA on Seminole were comparable to those "that a bank places on any borrower in connection with a secured transaction." Tr. of Oral Arg. 19. Given the immense variety of ways the Federal Government provides financial assistance, and the fact that such assistance is always accompanied by restrictions on its use, the inability of the "substantial supervision" test to provide any real guidance is apparent. "A criminal statute, after if not before it is judicially construed, should have a discernable meaning." *Dixson* v. *United States, supra,* at 512 (dissenting opinion).

Although the Government's sweeping interpretation of § 371—which would have, in effect, substituted "anyone receiving federal financial assistance and supervision" for the phrase "the United States or any agency thereof" in § 371—must fail, the Government also charged petitioners with conspiring to manipulate Seminole in order to cause misrepresentations to be made to the REA, an agency of the United States. The indictment against petitioners stated that:

> "It was further a part of the conspiracy that the defendants would and did cause Seminole Electric to falsely state and represent to the Rural Electrification Administration that an REA-approved competitive bidding procedure had been followed in awarding the access road construction contracts." App. 7.

If the evidence presented at trial was sufficient to establish that petitioners conspired to cause Seminole to make misrepresentations to the REA, then petitioners' convictions may stand. Because the sufficiency of the evidence on this particular charge in the indictment was not passed on below, we remand this case to the Court of Appeals for further proceedings on this question.

## IV

Each mail fraud count of the indictment charged Tanner and Conover with acting in furtherance of "a scheme and artifice to defraud:

"(a) the United States by impeding, impairing, obstructing and defeating the lawful function of the Rural Electrification Administration in its administration and enforcement of its guaranteed loan program; and

"(b) Seminole Electric Cooperative, Inc., of its right to have its process and procedures for the procurement of materials, equipment and services run honestly and free from deceit, corruption and fraud, and of its right to the honest and faithful services of its employees." *Id.,* at 12.

On appeal, petitioners argued that the evidence did not establish *either* a scheme to defraud the United States *or* a scheme to defraud Seminole. Petitioners' arguments on the scheme to defraud the United States were raised in the context of the § 371 convictions. If the § 371 convictions were reversed, petitioners argued, then the mail fraud convictions could stand only if the Government proved a scheme to defraud Seminole. 772 F. 2d, at 771.

The Court of Appeals discussion on this point is as follows:

"Appellants argue that the convictions on counts II through V can be upheld only if the evidence establishes that they used the mails in effectuating a scheme to defraud Seminole. This is so, appellants contend, because the indictment did not charge, and the evidence did not establish, a violation of 18 U. S. C. § 371. We have already rejected this proposition. *Thus, we need not reach the question of whether the evidence establishes the use of the mails for the purpose of effectuating a scheme to defraud Seminole." Ibid.* (emphasis added).

If, on remand, the premise on which the Court of Appeals based its affirmance of the mail fraud convictions—that peti-

tioners' actions constituted a conspiracy to defraud the United States under § 371—is rejected, the Court of Appeals must consider petitioners' argument that the evidence did not establish a scheme to defraud Seminole under the mail fraud statute, 18 U. S. C. § 1341.

The judgment of the Court of Appeals is affirmed in part and remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring in part and dissenting in part.

Every criminal defendant has a constitutional right to be tried by competent jurors. This Court has long recognized that "[d]ue process implies a tribunal both impartial and mentally competent to afford a hearing," *Jordan* v. *Massachusetts*, 225 U. S. 167, 176 (1912), "a jury capable and willing to decide the case solely on the evidence before it." *Smith* v. *Phillips*, 455 U. S. 209, 217 (1982). If, as is charged, members of petitioners' jury were intoxicated as a result of their use of drugs and alcohol to the point of sleeping through material portions of the trial, the verdict in this case must be set aside. In directing district courts to ignore sworn allegations that jurors engaged in gross and debilitating misconduct, this Court denigrates the precious right to a competent jury. Accordingly, I dissent from that part of the Court's opinion.[1]

I

At the outset, it should be noted that petitioners have not asked this Court to decide whether there is sufficient evidence to impeach the jury's verdict. The question before us is only whether an evidentiary hearing is required to explore

---

[1] I agree with the Court's disposition of petitioners' convictions under 18 U. S. C. §§ 371 and 1341. Thus, I join Parts III and IV of the Court's opinion.

allegations of juror misconduct and incompetency. As the author of today's opinion for the Court has noted:

"A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case." *Smith* v. *Phillips, supra,* at 222 (O'CONNOR, J., concurring).[2]

The allegations of juror misconduct in this case are profoundly disturbing. A few weeks after the verdict was returned, one of the jurors, Vera Asbel, contacted defense counsel and told him she had something she wanted to get off her conscience. App. 247. She stated that at the trial some of the male jurors were drinking every day and then "slept through the afternoons." *Ibid.* According to Asbel, another juror, Tina Franklin, could confirm these charges. *Ibid.* Despite these revelations, the District Court refused to hold an evidentiary hearing. Like this Court, the District Judge believed that Asbel's statements to defense counsel were inadmissible under Rule 606(b). *Id.,* at 181–182.

Several months later, Asbel's allegations were buttressed by a detailed report of rampant drug and alcohol abuse by jury members, volunteered by another juror, Daniel Hardy.[3] In a sworn statement, Hardy indicated that *seven* members

---

[2] See also *Remmer* v. *United States,* 347 U. S. 227, 229–230 (1954); *Sullivan* v. *Fogg,* 613 F. 2d 465, 467–468 (CA2 1980).

[3] Both Asbel and Hardy contacted defense counsel on their own initiative. Asbel telephoned, see App. 246–247, while Hardy simply showed up at counsel's home and stated: "I had some things on my mind that had been bothering me a long time and I wanted to clear my conscience." *Id.,* at 209. In addition, the District Judge reported that the jury foreperson had contacted his office. "She wanted to know when there was going to be a hearing and she wanted to testify." *Id.,* at 172. This is not a case where jury members were being pursued and harassed by losing litigants. Thus, the concerns underlying the local rule cited by the Court, *ante,* at 126, are not implicated in this case.

of the jury, including himself, regularly consumed alcohol during the noon recess. App. 210. He reported that four male jurors shared up to three pitchers of beer on a daily basis. *Id.*, at 212. Hardy himself "consumed alcohol all the time." *Id.*, at 239. The female juror selected as foreperson was described as "an alcoholic" who would drink a liter of wine at lunch. *Id.*, at 213–214. Two other female jurors regularly consumed one or two mixed drinks at lunch. *Id.*, at 215.

The four male jurors did not limit themselves to alcohol, however. They smoked marijuana "[j]ust about every day." *Id.*, at 222. In addition, two of them ingested "a couple lines" of cocaine on several occasions. *Id.*, at 225. At times two of the jurors used all three substances—alcohol, cocaine, and marijuana. *Id.*, at 229. Hardy also maintained that the principal drug user, identified as "John," used cocaine during breaks in the trial. *Id.*, at 234. "I knew he had that little contraption and he was going to the bathroom and come back down sniffing . . . like he got . . . a cold." *Id.*, at 234–235. Hardy's statement supported Asbel's assessment of the impact of alcohol and drug consumption; he noted that "[m]ost, some of the jurors," were "falling asleep all the time during the trial." *Id.*, at 229. At least as to John, the effects of drugs and alcohol went beyond inability to stay awake at trial: "John just talked about how he was flying," which Hardy understood to mean that "he was messed up." *Ibid.* Hardy admitted that on one day during the trial his reasoning ability was affected by his use of alcohol and marijuana. *Id.*, at 239. These allegations suggest that several of the jurors' senses were significantly dulled and distorted by drugs and alcohol.[4] In view of these charges, Hardy's characteriza-

---

[4] The Court's attempt to downplay the seriousness of the charges of incompetence is unconvincing: "The only allegations concerning the jurors' ability to properly consider the evidence were Hardy's observations that some jurors were 'falling asleep all the time during the trial,' and that Hardy's own reasoning ability was affected on one day of the trial." *Ante,* at 126. Even if this were the extent of the incompetence alleged, the

tion of the jury as "one big party," *id.*, at 209, is quite an understatement.

## II

Despite the seriousness of the charges, the Court refuses to allow petitioners an opportunity to vindicate their fundamental right to a competent jury. The Court holds that petitioners are absolutely barred from exploring allegations of juror misconduct and incompetency through the only means available to them—examination of the jurors who have already voluntarily come forward. The basis for the Court's ruling is the mistaken belief that juror testimony concerning drug and alcohol abuse at trial is inadmissible under Federal Rule of Evidence 606(b) and is contrary to the policies the Rule was intended to advance.

I readily acknowledge the important policy considerations supporting the common-law rule against admission of jury testimony to impeach a verdict, now embodied in Federal Rule of Evidence 606(b): freedom of deliberation, finality of verdicts, and protection of jurors against harassment by dissatisfied litigants. See, *e. g., McDonald* v. *Pless*, 238 U. S. 264, 267–268 (1915); Advisory Committee's Notes on Fed. Rule Evid. 606(b), 28 U. S. C. App., p. 700. It has been simultaneously recognized, however, that "simply putting verdicts beyond effective reach can only promote irregularity and injustice." *Ibid.* If the above-referenced policy considerations seriously threaten the constitutional right to trial by a fair and impartial jury, they must give way. See *Parker* v. *Gladden*, 385 U. S. 363 (1966); *Mattox* v. *United States*, 146 U. S. 140 (1892).

In this case, however, we are not faced with a conflict between the policy considerations underlying Rule 606(b) and petitioners' Sixth Amendment rights. Rule 606(b) is not ap-

---

claim that several jurors were "falling asleep all the time during the trial" and that one had impaired mental faculties raises a serious question of juror incompetence. If only one juror were shown to be incompetent, the verdict could not stand. Cf. *Parker* v. *Gladden*, 385 U. S. 363, 365–366 (1966).

plicable to juror testimony on matters *unrelated* to the jury's deliberations. By its terms, Rule 606(b) renders jurors incompetent to testify only as to three subjects: (i) any "matter or statement" occurring during deliberations; (ii) the "effect" of anything upon the "mind or emotions" of any juror as it relates to his or her "assent to or dissent from the verdict"; and (iii) the "mental processes" of the juror in connection with his "assent to or dissent from the verdict."[5] Even as to matters involving deliberations, the bar is not absolute.[6]

It is undisputed that Rule 606(b) does not exclude juror testimony as to matters occurring before or after deliberations. See 3 D. Louisell & C. Mueller, Federal Evidence §290, p. 151 (1979); cf. Note, Impeachment of Verdicts by Jurors—Rule of Evidence 606(b), 4 Wm. Mitchell L. Rev. 417, 431, n. 88 (1978). But, more particularly, the Rule only "operates to prohibit testimony as to *certain* conduct by the jurors which has no verifiable manifestations," 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶606[04], p. 606–28 (1985) (emphasis added); as to other matters, jurors remain competent to testify. See Fed. Rule Evid. 601. Because petitioners' claim of juror misconduct and incompetency involves objectively verifiable conduct occurring prior to deliberations, juror testimony in support of the claims is admissible under Rule 606(b).

---

[5] Rule 606(b) provides, in relevant part:

"[A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

[6] Rule 606(b) expressly authorizes jurors to testify as to "extraneous prejudicial information" or "outside influence." See *infra*, at 140, and n. 9.

The Court's analysis of legislative history confirms the inapplicability of Rule 606(b) to the type of misconduct alleged in this case. As the Court emphasizes, the debate over two proposed versions of the Rule—the more restrictive Senate version ultimately adopted and the permissive House version, reproduced *ante*, at 123, n., focused on the extent to which jurors would be permitted to testify as to what transpired *during the course of the deliberations themselves.*[7] Similarly, the Conference Committee Report, quoted by the Court, *ante*, at 125, compares the two versions solely in terms of the admissibility of testimony as to matters occurring during, or relating to, the jury's deliberations: "[T]he House bill allows a juror to testify about objective matters occurring during the jury's deliberation, such as the misconduct of another juror or the reaching of a quotient verdict. The Senate bill does not permit juror testimony about any matter or statement occurring *during the course of the jury's deliberations.*" H. R. Conf. Rep. No. 93–1597, p. 8 (1974) (emphasis added). The obvious conclusion, and the one compelled by Rule 601, is that *both* versions of Rule 606(b) would have permitted jurors to testify as to matters not involving deliberations. The House Report's passing reference to

---

[7] Proponents of the more restrictive Senate version were reluctant to allow juror testimony as to irregularities in the process by which a verdict was reached, such as the resort to a "quotient verdict." See, *e. g.*, 120 Cong. Rec. 2374–2375 (1974) (statement of Rep. Wiggins); 117 Cong. Rec. 33642, 33645 (1971) (letter from Sen. McClellan); *id.*, at 33649, 33655 (Dept. of Justice Analysis and Recommendations Regarding Revised Draft of Proposed Rules of Evidence for the U. S. Courts and Magistrates).

As the Court explains, *ante*, at 124, the Senate rejected the House version because it "would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's *internal deliberations*, for example, where a juror alleged that the jury refused to follow the trial judge's instructions or that some of the jurors did not take part in deliberations." S. Rep. No. 93–1277, p. 13 (1974) (emphasis added). See also *id.*, at 14 ("[R]ule 606 should not permit any inquiry into the internal deliberations of the jurors").

juror intoxication during deliberations, quoted *ante*, at 122–123, is not to the contrary. Reflecting Congress' consistent focus on the deliberative process, it suggests only that the authors of the House Report believed that the Senate version of Rule 606(b) did not allow testimony as to juror intoxication during deliberations.[8]

In this case, no invasion of the jury deliberations is contemplated. Permitting a limited postverdict inquiry into juror consumption of alcohol and drugs *during trial* would not "make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald* v. *Pless*, 238 U. S., at 267–268. "Allowing [jurors] to testify as to matters other than their own inner reactions involves no particular hazard to the values sought to be protected." Advisory Committee's Notes on Fed. Rule Evid. 606(b), 28 U. S. C. App., p. 701.

Even if I agreed with the Court's expansive construction of Rule 606(b), I would nonetheless find the testimony of juror intoxication admissible under the Rule's "outside influence" exception.[9] As a common-sense matter, drugs and

---

[8] H. R. Rep. No. 93–650, p. 10 (1973) ("Under this formulation a quotient verdict could not be attacked through the testimony of a juror, nor could a juror testify to the drunken condition of a fellow juror which so disabled him that he could not participate in the jury's deliberations").

[9] The sole support for the Court's cramped interpretation of this exception is the isolated reference to juror intoxication *at deliberations*, contained in the House Report, quoted *supra*, n. 8. The source for the reference is a letter to the House Subcommittee, to the effect that the version of the Rule adopted by the Senate would not allow inquiry into juror consumption of alcohol during deliberations. The letter was offered in support of reinstatement of the original form of the Rule (the version adopted by the House); the letter focused primarily on the question whether inquiry into quotient verdicts should be permitted. See Rules of Evidence, Hearings before the Special Subcommittee on Reform of Federal Criminal Laws of the House Committee on the Judiciary, 93d Cong., 1st Sess., 389 (1973). In a subsequent letter, the writer dropped any reference to the question of intoxication, focusing exclusively on the issue of

alcohol *are* outside influences on jury members. Commentators have suggested that testimony as to drug and alcohol abuse, even during deliberations, falls within this exception. "[T]he present exception paves the way for proof by the affidavit or testimony of a juror that one or more jurors became intoxicated during deliberations. . . . Of course the use of hallucinogenic or narcotic drugs during deliberations should similarly be provable." 3 Louisell & Mueller, Federal Evidence, § 289, pp. 143–145 (footnote omitted). See 3 Weinstein & Berger, Weinstein's Evidence, *supra,* ¶ 606[04], pp. 606–29—606–32 ("Rule 606(b) would not render a witness incompetent to testify to juror irregularities such as intoxication . . . regardless of whether the jury misconduct occurred within or without the jury room"). The Court suggests that, if these are outside influences, "a virus, poorly prepared food, or a lack of sleep" would also qualify. *Ante,* at 122. Distinguishing between a virus, for example, and a narcotic drug is a matter of line-drawing. Courts are asked to make these sorts of distinctions in numerous contexts; I have no doubt they would be capable of differentiating between the intoxicants involved in this case and minor indispositions not affecting juror competency.

The Court assures us that petitioners' Sixth Amendment interests are adequately protected by other aspects of the trial process: *voir dire;* observation during trial by the court, counsel, and courtroom personnel; and observation by fellow jurors (so long as they report inappropriate juror behavior to the court before a verdict is rendered). *Ante,* at 127. Reliance on these safeguards, to the exclusion of an evi-

---

quotient verdicts. See Rules of Evidence (Supplement), Hearings before the Subcommittee on Criminal Justice of the House Committee on the Judiciary, 93d Cong., 1st Sess., 27–28 (1973). Moreover, this reference is hardly dispositive. The comparison was provided to show that the House version was "the better practice." H. R. Rep. No. 93–650, *supra,* at 10. None of the subsequent Committee Reports make any allusion to juror intoxication.

dentiary hearing, is misguided.  *Voir dire* cannot disclose whether a juror will choose to abuse drugs and alcohol during the trial.   Moreover, the type of misconduct alleged here is not readily verifiable through nonjuror testimony.   The jurors were not supervised by courtroom personnel during the noon recess, when they consumed alcoholic beverages and used drugs.   Hardy reported that he and his three companions purposely avoided observation.   They smoked marijuana and used cocaine first in a municipal parking garage and later "[d]own past the Hyatt Regency" because it was "away from everybody."   App. 218, 222.

Finally, any reliance on observations of the court is particularly inappropriate on the facts of this case.   The District Judge maintained that he had a view of the jury during the trial, and "[y]ou might infer . . . that if I had seen somebody sleeping I would have done something about that."   *Id.*, at 167.   However, as the portions of the trial transcript quoted *ante*, at 113–114, indicate, the judge had abdicated any responsibility for monitoring the jury.   He stated: "I'm going to—not going to take on that responsibility" and "I'm not going to sit here and watch.   I'm—among other things, I'm not going to see—. . . ."   Tr. 12–100—12–101.

## III

The Court acknowledges that "postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior," but maintains that "[i]t is not at all clear . . . that the jury system could survive such efforts to perfect it."   *Ante*, at 120.   Petitioners are not asking for a perfect jury.   They are seeking to determine whether the jury that heard their case behaved in a manner consonant with the minimum requirements of the Sixth Amendment. If we deny them this opportunity, the jury system may survive, but the constitutional guarantee on which it is based will become meaningless.

I dissent.