LOKEN, Circuit.Judge,
dissenting.
I respectfully dissent. In my view, the majority’s opinion misrepresents the factual record, misstates the district court’s procedural and evidentiary rulings, and ignores the context of those rulings. The majority accepts defendants’ view of numerous issues of disputed fact, violating our duty to respect the jury’s verdict. I leave to the district court the task of separating appellate fact *579 from fiction when the case is retried. But I will explain the reasons why I believe this decision is very wrong.
I. Convincing Evidence of Guilt.
The majority takes many liberties with the trial record in attempting to cast doubt on the jury verdict that defendants committed some, but not all, of the alleged acts of criminal sexual abuse of five young girls. The government based its case on the testimony of two physicians, the four oldest victims, another child who witnessed sexual abuse, and FBI Agent Van Roe. A brief review of that evidence is needed to set the record straight.
A. The Basic Chronology. The South Dakota Department of Social Services (“DSS”) placed R.R. in Donna Jordan’s foster home on November 9, 1993, because of neglect and malnutrition. In early January, Jordan reported to DSS (as she was required to do) that R.R. said she had been sexually abused. On January 10, DSS told Jordan to take R.R. to therapist Ellen Kelson. After an initial interview, Kelson reported to DSS (as she was required to do) that R.R. had reported acts of sexual abuse against herself and other children in the Rouse home. On January 11, DSS removed children living in the Rouse home and placed them in Jordan’s foster home. On January 15, Dr. Richard Kaplan examined the children. On January 19, FBI Agent Van Roe and BIA Agent Hudspeth interviewed the children. That evening, they were seen by a psychiatrist, who referred them to Kelson for therapy. Kelson first saw the children in a group on January 22. The majority frequently misstates or obfuscates these undisputed chronological facts.
B. The Medical Evidence. After performing the initial medical examinations on January 15, Dr. Kaplan reported to DSS his medical findings and what the children had told him about sexual abuse. J.R. told Dr. Kaplan, “Uncle Jess hurt me,” pointing to her left labia; Dr. Kaplan found a recent bruise or contusion consistent with that kind of abuse. L.R. had “a fairly acute injury” on the right side of her labia majora which “really hurt her.” R.R. told Dr. Kaplan, “I have a bruise where my uncle put his private spot,” and Dr. Kaplan found a sagging vagina and a scar on her anus. Dr. Kaplan found that T.R. had “obvious trauma and contusion ... and very, very much tenderness” on her labia majora; T.R. told him, “Uncle Jess hurt me there.”
On February 11, Dr. Robert Ferrell conducted a colposcopic examination of the five victims. Dr. Ferrell found “very significant” damage to R.R.’s hymenal ring and tearing in her anal area consistent with anal intercourse. He noted a “whole constellation of findings” indicating L.R. had been abused— damage to her hymenal area, furrowing on either side of her vagina, chronic irritation or trauma, and “clue cells” that are “known to be sexually transmitted.” To Dr. Ferrell, a scar on J.R.’s hymen where a tear had healed was an “important finding,” while T.R.’s “hymenal ring was essentially gone,” the entire area was irritated, and she had furrows in her vagina. Infant F.R. had “tearing and scarring of the anal mucosa.”
Defendants’ medical expert, Dr. Fay, admitted that the reported hymenal scarring on L.R., R.R., and J.R. “certainly ... leads you to think about sexual abuse,” and that “a labial injury ... is a very significant finding” of abuse. In its rebuttal, the government called Dr. Randall Alexander, a member of the Board of Governors of the National Committee to Prevent Child Abuse. Dr. Alexander testified that it takes considerable force to Inflict labial injuries like those exhibited by three of the victims. “It’s rare to see one [in young girls] and to see three of them show up is just ... rareness to the third power.”
On this record, the majority dissembles when it repeatedly opines that the government presented “inconclusive” medical evidence of sexual abuse.
C.The Victims’ Testimony. At trial, four victims testified that defendants sexually abused them (the fifth victim, infant F.R., was too young to testify). Their nine-year-old cousin testified that three defendants shut him in the attic when he saw them abusing T.R. A few observations about this testimony. *580 First, the victims’ trial testimony was consistent with their “free recall” — the reports of abuse R.R. volunteered to Donna Jordan in early January, and the four oldest victims made to Dr. Kaplan during his January 15 medical examinations. These unpro-grammed reports preceded the FBI interviews and Ellen Kelson’s therapy. Is that significant? I refer to the majority’s non-testifying experts, Ceei and Brack, in the “Conclusions” portion of their Suggestibility article, 113 Psych. Bulletin at 433:
[I]t is of the utmost importance to examine the conditions prevalent at the time of a child’s original report about a criminal event.... If the child’s disclosure was made in a nonthreatening, nonsuggestible atmosphere, if the disclosure was not made after repeated interviews, if the adults who had access to the child prior to his or her testimony are not motivated to distort the child's recollections through relentless and potent suggestions and outright coaching, and if the child’s original report remains highly consistent over a period of time, then the young child would be judged to be capable of providing much that is foren-sieally relevant.
Likewise, Dr. Underwager testified for the defense:
Q What' has the research told us about the types of questions that should be asked?
A Basically, the most reliable information is obtained from free recall.
Second, it is certainly true that the prosecutor asked the children leading questions at trial. When the first child witness (the nine-year-old male cousin) froze on the stand in open court, the district court, consistent with numerous Eighth Circuit cases, ruled that leading questions could be asked of reticent child witnesses. Defendants did not object to this ruling nor raise the issue on appeal.
Third, defendants did object to permitting three of the child witnesses to testify by closed circuit television. The district court questioned each child in chambers, in the presence of defense counsel, one prosecutor, the child’s guardian ad litem, and a court reporter. See 18 U.S.C. § 3509(b)(1)(C). Five-year-old J.R. was unable to speak when called to testify and stated in chambers that she was aft-aid to speak in front of her uncles. Six-year-old R.R. was found sobbing outside the courtroom and affirmed in chambers, that she was crying out of fear of her uncles. Nine-year-old T.R. became so fearful before testifying that “the guardian ad litem would have had to physically puli'her into the courtroom.” The court found that defendants’ presence in the courtroom would prevent these three children from testifying and permitted them to testify in chambers by closed circuit television.[21] Though I share the concerns expressed by Justice Scalia in his dis-sénting opinion in Maryland v. Craig, 497 U.S. 836, 867-69, 110 S.Ct. 3157, 3175-76, 111 L.Ed.2d 666 (1990), I conclude the court properly resolved this issue under Maryland v. Craig, Hoversten v. Iowa, 998 F.2d 614 (8th Cir.1993), and 18 U.S.C. § 3509(b). The majority apparently agrees.
D. The FBI Interviews. After a hearing outside the jury’s presence, the district court permitted FBI Agent Van Roe to testify to what the three oldest victims said during his January 19, 1994, interviews because those hearsay statements were spontaneous and trustworthy. Though defendants challenge this ruling on appeal, “a formidable line of Circuit precedent ... sanctions the use of hearsay testimony in child sexual abuse cases.” United States v. St. John, 851 F.2d 1096, 1098 (8th Cir.1988).
Accepting this ruling, the majority instead chides the district court for excluding evidence of March 1994 interviews that were “essential to the defense.”[22] But the district court did not exclude that evidence. When *581 Desmond Rouse’s attorney asked if he could cross-examine Agent Van Roe regarding the March interviews, the court responded that such questions were beyond the scope of Van Roe’s direct testimony and raised distinct reliability questions. However, said the court, “If you want to do something later, that is up to you. I’m not trying to tell you how to try your case.” Though Van Roe was recalled as a defense witness, he was not questioned about the March interviews.
Finally, it is worth noting in surveying the evidence that the government’s rebuttal included testimony by another FBI agent that Jessie Rouse and Desmond Rouse made damaging admissions when interviewed on January 25,1994.
E. The Majority’s Riposte — (1) Donna Jordan as the Grand Inquisitor. Jordan was the victims’ foster mother, a function she has performed for over ninety children for seventeen years. She was not involved in law enforcement. She never “interviewed” the children. She was not asked as a witness to relate what the victims told her. Yet the majority asserts that Jordan “told them their uncles were at fault and she got very specific about the ‘bad’ things their uncles were doing to them.” Supra, at p. 564. Let us see how Jordan described these supposedly sinister conversations during her cross examination at trial:
Q You have gone to each one of the girls one by one and in groups, and you have told them that their uncles have been raping them?
A No. Never. No.
Q What specific bad things have you told the girls that the uncles were doing?
A When they were first talking about their sexual abuse—
Q I’m talking about what you have said to the kids.
A I just say it’s wrong when they bring up the subject, and I say it’s wrong, it’s wrong, it’s bad. But there is nothing, you know — that’s it.
Q Have you talked to these kids both alone and in groups?
A No.
Q Well—
A Unless they come — I mean things can happen at home.' Someone can come up and say something while you are fixing supper or whatever you are doing, and start talking about something. But, no, not deliberately talking about this. No. I haven’t.
The majority’s attempt to label Jordan as a forensic ,interviewer who bombarded the victims with “a practice of suggestibility” in effect accuses Jordan of lying under oath and improperly performing her duties. It also twists the record to fit the majority’s unsupportable view of the case. .
(2) Ellen Kelson as the Grand Inquisitor. After initial medical examinations and FBI interviews, the children were referred by a psychiatrist to Ms. Kelson for therapy. Because the children were Medicaid patients, DSS was Kelson’s client, and she was required to submit her session notes. When Jean Brock suddenly left DSS in March 1994,[23] Kelson began sending these confidential notes to an Assistant U.S. Attorney to ensure that only authorized persons saw them, a fact the majority uses to place Kel-son in the prosecutor’s camp. But she conducted no forensic interviews of the children, and the government did not call her as a witness.
Defendants did call Kelson at trial and questioned her for some 150 transcript pages in an unsuccessful effort to convince the jury that Kelson had “implanted” the victims’ memories, thereby contaminating their trial testimony. The majority accepts this theory, calling Kelson primarily responsible for the “practice of suggestibility.” The majority encourages defense counsel to call a victim’s pretrial therapist, question about the nature of the therapy, and then call a psychologist who will opine that the therapist’s counseling destroyed the credibility of the child’s trial testimony. This tactic if widely used would *582 force the ■ government to choose between timely therapy for the child victim, and effective prosecution of the child abuser. This is terrible public policy, contrary to congressional mandates. District courts should block such injustice in future cases by exercising their discretion to preclude defendants from introducing evidence of pretrial therapy or counseling by a professional who has not testified in the government’s ease-in-chief.
(3) Excluded Evidence of Other Sexual Activity. Defendants filed Rule 412 motions to introduce evidence that one victim had been sexually active. The district court denied the motions because the defense learned about this evidence from an interview with a young boy almost three months before trial. I conclude, and the majority apparently agrees, that the district court did not abuse its discretion by excluding this evidence as untimely. See Rule 412(c)(1)(A); United States v. Provost, 875 F.2d 172, 177-78 (8th Cir.), cert. denied, 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989).
Defendants’ Rule 412 evidence consisted primarily of a claim by one defendant’s eleven-year-old son that he had “sex” with the victim, which she denied. After reviewing .interview reports, the district court expressed concern that this evidence “could wind up creating a mini trial as to whether ... this experimentation took place.” But the court refrained from ruling on whether this evidence of sexual activity would be admissible if the government presented medical evidence of genital injuries. That is the relevant inquiry. See Rule 412(b)(1); United States v. Bear Stops, 997 F.2d 451, 454-56 (8th Cir.1993); United States v. Eagle Thunder, 893 F.2d 950, 954 (8th Cir.1990). Though the government offered such injury evidence, when defendants called the boy as a defense witness, they did not question him regarding this alleged sexual activity. Thus, the district court dealt with the merits of this issue correctly, and the majority’s suggestions to the contrary reflect a distressing ignorance of the trial record.
II. Dr. Underwager’s Testimony.
Dr. Underwager’s testimony was the culmination of the defense strategy to destroy the credibility of the victims’ trial testimony by proving that this testimony was the product of “implanted” memories. The exclusion of some of Dr. Underwager’s proffered testimony provokes a dissertation by the majority on Daubert and “soft science.”[24] Proper review of this issue instead requires careful attention to its procedural context.
Before Dr. Underwager testified, the district court held a hearing to determine whether this expert would provide sufficiently reliable scientific evidence that would assist the jury to understand or determine a fact in issue. See Fed.R.Evid. 702; Daubert, 509 U.S. at 591,113 S.Ct. at 2796. When the .court asked what opinions Dr. Underwager proposed to express at trial, defense counsel submitted a letter from Dr. Underwager stating:
Based upon my review of the documents you have supplied, including but not limited to, therapist notes, FBI reports, and other documents, it is my opinion that the children in this case have been subjected to massive and coercive social influence by adults.... The level of adult influence is such as to make it highly likely any statements are so contaminated by adult behaviors as to be unreliable.... If asked, my opinion is that there is such a low probability of any sexual abuse by the defendants, that a reasonable person must conclude it did not take place.
The court also heard Dr. Underwager describe his theories of “learned” or “implanted” memory, and" it reviewed some of the literature to which he referred (including the Ceei and Brack article extensively cited by the majority). The court ruled:
I’m not going to allow Dr. Underwager to testify as to whether or not the [child] witness’s testimony is believable or not, or telhng the truth or not.... [Tjhere may be other areas that Dr. Underwager may be proffered to testify on, and those will have to be, or may be anyway, the subject *583 of an offer of proof when we get to that point.
The majority concedes, as it must, that this preliminary ruling was correct. Assessing the reliability or credibility of a victim’s accusations is the exclusive function of the jury; it is not a proper subject of expert testimony. See Westcott v. Crinklww, 68 F.3d 1073, 1076 (8th Cir.1995); United States v. Whitted, 11 F.3d 782, 785-86 (8th Cir.1993); United States v. Azure, 801 F.2d 336, 339-40 (8th Cir.1986). Dr. Underwager’s attempts to express such opinions in other child abuse cases have been consistently rejected. See State v. Swan, 114 Wash.2d 613, 790 P.2d 610, 632 (1990) (en banc), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); State v. Erickson, 454 N.W.2d 624, 627-29 (Minn.App.1990).
The district court also made a second preliminary ruling. Because this is an area of valid scientific inquiry, the court ruled that Dr. Underwager could express his own expert opinions and explain his own prior research. But regarding the theories and writings of other psychologists, the court concluded:
there is not anywhere near yet the agreement in the [scientific] community as to methods, techniques, testings or reliability that would warrant the admissibility before a jury of these matters.... It would result in a confusion of the issues, a possible misleading of the jury.... So, for these reasons, under Daubert, I’m not going to allow evidence with regard to the different ... psychological methods of evaluating the reliability of witnesses.
The majority does not question this exercise of the court’s discretion, perhaps because the Ceei and Bruck article is itself a compendium of conflicting theories and opinions on this subject dating back to 1900. As. an aside, many of the majority’s citations are to Ceci and Brack’s summaries of other experts’ work, some of it more than ninety years old.
With that procedural background, I will summarize Dr. Underwager’s trial testimony for the defense, organizing that testimony into the categories of “suggestibility” evidence that the majority claims were totally excluded (supra, at pp. 568-72):
1. Asking children leading questions at trial. After opining that open questions produce more reliable information, Dr. Un-.derwager asserted, “an adult who has a bias, a preconceived assumption, tends very quickly to go to leading questions, go to coercive questioning in order to get what they think that they need or want.” The district court then sustained an objection to a later question, “What would be your comment in regard to the form of the questions [asked of the children at trial]?”
2. A child will give authoritative interviewers what the child perceives is desired. “[I]t’s very clear that when the person doing the questioning starts with the assumption that there’s been abuse, that’s what you get, that’s what you produce from the child.”
3. Repetitive questioning can change a child’s answers. “[T]he repeating of questions is one of the most powerful ways that adults influence children to produce the answers the adult wants. Parents know this.”
4. Younger children are more susceptible to suggestibility than older children. “The younger the child, the greater the suggestibility, the more vulnerable they are to the influences.”
5. Anatomical dolls and sex play will not necessarily produce reliable evidence of sex abuse. “Play therapy has no therapeutic value whatsoever. . In fact, the research evidence suggests that it’s harmful. ... [Play therapy is] all Freudian Stuff, and there’s no scientific support whatsoever for those concepts.” Dr. Un-derwager was then asked about research “into the effects of play therapy where the allegations of sexual abuse may not be true,” an objection was sustained, and defense counsel dropped the issue. ■
6. Children lie when motivated to lie. “[V]ery frequently the adult will give some kind of promised reward ... to shape the behaviors of children.” Adults also use “what psychologists know as negative reinforcement; that is, the removal of an adverse stimulus.... [These techniques are] very powerful and very often used.”
*584 7.. “Cross germination” among a group of children will produce inaccurate memories. “When children talk to each other, they have an effect on each other, and they can communicate ... stories that are picked up on.” “[Y]ou can produce changes, and accounts shift and move and all kinds of things happen.”
8. On the general subject of implanted memory. “[M]emories are now shown to be implanted[. There] can be a complete nonevent, but a memory can be created ... by questioning someone.”
In my view, this summary conclusively demonstrates that every category of “suggestibility” evidence identified by the majority was the subject of an opinion expressed by Dr. Underwager to the jury. That should be the end of the matter on appeal. The jury learned how the child victims were medically examined, interviewed, and counseled before trial. It saw and heard the children testify. And it heard Dr. Underwager’s opinions as to factors that might influence .the reliability of that testimony. The district court correctly concluded that this was an adequate evi-dentiary basis for the jury to make its ultimate credibility findings.[25]
Rather than examine what the jury in fact heard, the majority places the cart before the horse by starting with the offer of proof made by defense counsel at the conclusion of the above-summarized testimony. That offer was made because the district court precluded Dr. Underwager from commenting oh the form of the questions asked the child witnesses at trial.[26]
The majority states that the crucial question and answer in the offer of proof was, “is it your belief that there’s been a practice of suggestibility employed,” and Dr. Underwager’s cryptic answer, ‘Tes, sir.” Supra, at p. 569-72. I disagree. What was “crucial” to the. district court was the very next question, “could you explain to the Court how you observed that,” and Dr. Underwager’s three-page narrative answer. In that answer, Dr. Underwager opined (i) that therapist Kelson had exerted “massive social influence” on the victims; (ii) that Kelson engaged in “highly suggestive and highly contaminating” practices; (iii) that the prosecutor used leading questions at trial and the children “were comfortable doing the yes/no bit,” showing “they’d learned” to answer yes; (iv) that Van Roe’s use of diagrams was “very suggestive and very leading”; (v) that the children “were kidnapped ... taken from their families, taken to this strange place where all of the people are concerned that they talk about sex abuse”; and (vi) that the “total environment [was] one of the most powerful and coercive influences upon children that I’ve seen.”
That was totally improper “expert” testimony. If Dr. .Underwager may not opine that the children’s trial testimony was not credible, as we have often ruled, then the district court properly precluded him from indirectly stating that same opinion. For example, if Dr. Underwager has expressed the opinion that leading questions produce testimony that is not credible, then his opinion that the prosecution asked leading questions at trial is, quite obviously, an opinion that the children’s testimony was not credible. Defendants’ offer of proof reflected Dr. Underwager’s passionate attempt to find a *585 court — any court — that will allow him to opine that particular child witnesses -have not told the truth. Those opinions have been rejected by every court which has considered them, they were rejected by the district court, and they are rejected in theory by the majority. Yet these convictions are reversed because defendants’ offer of proof was denied!
The district court properly “circumscribed [Dr. Underwager’s testimony] so as to educate rather than to usurp the role of the jury.” United States v. Johns, 15 F.3d 740, 743 (8th Cir.1994). I have no doubt that if defendants had asked Dr. Underwager to describe a “pattern of suggestibility,” without opining whether one occurred in this case, the district court would have allowed that addition to the opinions he did express to the jury. In other words, the majority’s stated reason for reversal is a contrivance, apparently born of a desire to publish a lecture on Daubert and a distaste for either this type of prosecution or the long prison sentences it has produced.
III. Denial of Defense Psychological Interviews.
Prior to trial, the victims were in DSS’s custody. The majority criticizes DSS’s efforts to isolate the young victims[27] and holds that the district court abused its discretion in denying defendants’ motions to subject the victims to adversarial psychological examinations by Dr. Underwager. I disagree.
Defendants and Dr. Underwager had available to them the reports of the victims’ medical examinations, Agent Van Roe’s interview reports, and therapist Kelson’s extensive notes of her sessions with the children. Dr. Underwager stated at the motion hearing that he had sufficient information to assess whether the children had been sexually abused. He observed the trial testimony of the victims and therapist Kelson, assisted defendants at trial, testified regarding the effects of child interview techniques, and was prepared to express opinions on the suggestibility of the investigative and therapeutic practices employed. In these circumstances, defendants’ motions for further psychological examinations were properly denied. See United States v. Spotted War Bonnet, 882 F.2d 1360, 1362 (8th Cir.1989) (subsequent history omitted) (interview properly denied because defense expert reviewed other interview records and was present when victim testified).
In denying these motions, the district court properly considered the victims’ interests, requiring defendants to show good cause for this “additional intrusion into the alleged victims already troubled lives.” An adult witness may simply refuse to undergo adversarial medical or psychological examinations. See United States v. Bittner, 728 F.2d 1038, 1041 (8th Cir.1984). With children in protective custody, the issue is more complex because they are not able to make such decisions for themselves. The trial court must protect a criminal defendant’s right to a fair trial, but it must also protect the State’s paramount interest in the welfare of the child. At a minimum, the court should heed a custodial agency’s opinion that an investigative or adversarial examination is unnecessary or unwise.[28]
*586 Here, the children’s guardian opposed further psychological examinations, particularly by adversarial experts, and defendants did not show need for the requested examinations. On this record, the majority’s decision that the district court nonetheless abused its discretion in declining to order the examinations raises a barrier to the prosecution of these kinds of crime by maximizing the trauma that victims must routinely endure. Congress has repeatedly legislated the opposite public policy, for example, in enacting Rules 412, 413, and 414 of the Federal Rules of Evidence. This aspect of the majority’s decision is, in a word, lawless.
IV. Conclusion.
I have carefully reviewed defendants’ other contentions on appeal and conclude that each is without merit. One — the allegedly biased juror — is mentioned by majority in yet another gratuitous slap at the way the district court conducted this trial. In fact, after a thorough evidentiary hearing on this issue, the court found that juror Pickard was the target of a spiteful co-worker whose testimony was not credible. It further found that juror Pickard had not concealed “any racially prejudiced attitudes, beliefs, or opinions” and that “no improper outside influence affected the jury.” These findings established that defendants were not entitled to a new trial on this ground. See Tanner v. United States, 483 U.S. 107, 120-27, 107 S.Ct. 2739, 2747-51, 97 L.Ed.2d 90 (1987); McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); United States v. Whiting, 538 F.2d 220, 222-23 (8th Cir.1976); Fed.R.Evid. 606(b). On this record, for the majority to suggest that defendants did not “receive a fair trial without the impaet of racial bias” is outrageous.
This was a difficult case to try. The record reflects that the district court dealt carefully, fairly, and impartially with the many issues that arose before, during, and after the trial, and that the jury deliberated carefully in convicting defendants on some counts and acquitting them on many others. The majority now likens this to the Salem Witch Trials! That is an indictment of all the government officials involved in these proceedings — and most particularly, of an exceedingly competent and fair 'United States District Judge — that I cannot abide. I would affirm the judgments of the district court.

. The system included five monitors in the courtroom for the judge, jury, defense expert, and defendants to view the child testifying in chambers; a monitor for the child witness to •view defendants as she testified; and separate communication lines permitting each defendant to confer with his attorney.

. The majority also insinuates that BIA Agent Hudspeth asked the children leading questions at the January interviews, apparently unaware that the district court specifically asked Agent Van Roe that question. Van Roe testified that Hud-speth did not do so.

. When called as a defense witness, social worker Brock testified that she never interviewed the victims about alleged sex abuse and denied telling children they were being taken to a foster home because their uncles had been doing bad things to them. Thus, the majority’s repeated assertions to the contraiy are improper.

. The majority's suggestion that Daubert principles do not apply to "social science evidence” (supra, at p. 568) is contrary to the law of this circuit. See United States v. Reynolds, 77 F.3d 253 (8th Cir.1996); Gier v. Educational Service Unit No. 16, 66 F.3d 940 (8th Cir.1995).

. Defense counsel had no trouble using this expert testimony to define their theory of implanted memory in closing argument:
The questions were asked over and over and over again and, when the story came out the way the adults wanted it, then the children were rewarded.... [W]hen [J.R.] was testifying ... did you notice [the prosecutor] ... phrased most of the questions in a manner in which she would get a positive response, a “Yes" answer.... [Dr. Underwager] talked about the influence that people have on children, when they interview kids. He talked about memory, the process of reconstruction, implantation of memory, play-therapy, worthless.... The children only felt comfortable answering "Yes” or "No”. They didn't show memory of the events. The FBI Agent's diagram that he used, the drawing of the male body with the penis drawn in, what did that tell the kids that he wanted to talk about? Everything was calculated to produce some sort of compliance with these kids....

. In my view, the entire offer of proof was without merit. Defendants never objected to the court’s ruling that leading questions could be put to reticent child witnesses. Having waived the issue, defendants may not then have their nonlegal "expert" criticize questions the court has permitted.

. When a child witness is in the legal custody of a social services agency, that agency as custodian may refuse requests for pretrial interviews. See Thornton v. State, 264 Ga. 563, 449 S.E.2d 98, 109-10 (1994); Hewlett v. State, 520 So.2d 200, 203-04 (Ala.Crim.App.1987); see also State ex rel. O’Leary v. Lowe, 307 Or. 395, 769 P.2d 188, 192-93 (1989) (en banc). Defendants concede that DSS made the decision to deny access. They do not claim that the prosecution interfered, and they never complained to the district court that DSS had denied them pretrial access to the children. Moreover, the victims' appointed legal guardian advised the court at a motion hearing that questions of access and custody were subjects of a separate tribal court proceeding.

. Unlike the court in United States v. Benn, 476 F.2d 1127, 1130-31 (D.C.Cir.1973), I do not assume that the criminal justice arm of government may compel pretrial testing of a child that a social services arm of government believes to be adverse to the child's best interests. To posit an extreme example, if a government custodian should opine that the interests of a child witness require dismissing a prosecution rather than compelling the child to undergo further traumatic testing, and if the court can devise no other way to protect the defendant's right' to a fair trial, the criminal case may have to be dismissed.