NOTICE

Decision filed 04/29/08. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-06-0588

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) St. Clair County. |
| | ) |
| v. | ) No. 05-CF-1094 |
| | ) |
| JON E. CEARLOCK, | ) Honorable |
| | ) John Baricevic, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

PRESIDING JUSTICE STEWART delivered the opinion of the court:

The defendant, Jon E. Cearlock, was tried before a jury on charges of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) and concealment of a homicidal death (720 ILCS 5/9-3.1(a) (West 2004)). After the jury announced that it was deadlocked, the trial court declared a mistrial and discharged the jury. The defendant later filed a motion to bar further prosecution, alleging that juror misconduct resulted in a denial of his constitutional right to a trial before an impartial jury (Ill. Const. 1970, art. I, §8) and a violation of the prohibition against double jeopardy (Ill. Const. 1970, art. I, §10). The defendant also alleged that the court should bar a retrial pursuant to section 3-4(a)(3) of the Criminal Code of 1961 (the Criminal Code) (720 ILCS 5/3-4(a)(3) (West 2004)). After an evidentiary hearing, the trial court denied the defendant's motion. The defendant appeals from the denial of that motion. We have jurisdiction to consider this interlocutory appeal pursuant to Illinois Supreme Court Rule 604(f). 210 Ill. 2d R. 604(f) ("The defendant may appeal to the Appellate Court the denial of a motion to dismiss a criminal proceeding on grounds of former jeopardy").

The defendant raises the following issues, which he characterizes as issues of first

1

impression in Illinois:

1. "Can a juror arbitrarily refuse to vote for a not guilty verdict, while at the same time acknowledging that the State did not prove its case against the defendant beyond a reasonable doubt, without triggering the statutory protection" of section 3-4(a)(3) of the Criminal Code, "which bars retrial in the event of an original trial's improper termination before a verdict is attained?"

2. "Does the constitutional guarantee not to be placed twice in jeopardy for the same offense[] protect the criminally accused from being retried[] after a trial at which one of his impaneled jurors was so predisposed to convict[] that she repeatedly, and steadfastly, voted for a finding of guilt, despite open and direct acknowledgment that, in her judgment, the evidence was insufficient to establish guilt?"

We affirm.

BACKGROUND

The prosecution and the defense stipulated that the defendant and Paula Weinmann had consensual sex in the early morning hours of July 2, 2005, and that Paula's body was found on July 6, 2005. Witness testimony established that, after a St. Louis Cardinals baseball game, Paula and a friend, Tracy Tate, went to a bar, where Paula met and talked with the defendant. When the bar was about to close, the defendant and four of his friends left the bar with Paula. Paula drove her car to another bar, PT's, where everyone in the group, except Paula and the defendant, went inside. After about an hour, the defendant came into PT's without Paula and told his friend and roommate, Jordan Matlock, that they needed to leave, that he needed Jordan's help, and that something bad had happened. Jordan testified that the defendant looked scared when he said these things.

Jordan and the defendant left PT's in Paula's car, without Paula, and Jordan did not know where Paula was. As they drove down the road, Jordan threw Paula's purse and other

2

possessions out of the car window at the defendant's instructions. An Illinois State Police officer, Benjamin Koch, testified that he found several of Paula's possessions, including her purse, along the highway where Jordan said he threw them. Jordan testified that the defendant explained that after he and Paula had sexual intercourse, he exited the car, Paula said something about cuddling, and she got out of the car and sprayed him with "mace." According to Jordan, the defendant said that he went down on one knee, came up, kicked her, and then shot her. Jordan testified that he did not believe that the defendant had actually killed Paula because "Jon's known to stretch the truth."

Jordan testified that he and the defendant went to a store and purchased ammonia and a spray bottle, which they used to clean out the car and remove their fingerprints and DNA. Jordan testified that he hit the front windshield with the defendant's gun, cracking the windshield, before he and the defendant abandoned it. They left the keys on the front seat, walked to a White Castle restaurant, and got a ride home from a stranger. A St. Louis city police officer, Doug Eatherton, testified that Paula's car was found on a lot in St. Louis, Missouri, before Paula's body was discovered; the car was locked; the keys were on the front seat; and the front windshield was damaged. Another St. Louis city police officer, Mark Oman, an evidence technician, testified that he processed Paula's car while she was still thought to be missing. Officer Oman testified that the passenger-side front windshield was cracked and broken and that the interior smelled of cleaning solvent, which would have eliminated most evidence of fingerprints, blood, and DNA.

At their apartment building, Jordan and the defendant went to Chad Chappie's apartment. Chad was one of the men who had gone to PT's with them. Chad testified that Jordan called him at about 6 a.m. on July 2, 2005, saying that he and the defendant were coming to his apartment. Shortly thereafter, Chad heard loud banging on his apartment door, and when he opened it, Jordan and the defendant were standing there. Chad testified that

3

Jordan told him, "You did not see us last night." The defendant was pacing and sweating profusely. Chad also testified that sometime before July 2, 2005, he had purchased a .22-caliber handgun from the defendant but that the defendant had bought it back from him two or three weeks before July 2, 2005. Jordan testified that the defendant owned a .22-caliber handgun, and the defendant's girlfriend, Kattie Riggs, testified that he owned a small handgun, although she did not know its caliber.

Adam Rhodes testified that a few days after July 2, 2005, the defendant asked him to get rid of his gun for him. Adam testified that the defendant said that he was in a "sticky situation" and that Kattie would retrieve the gun, car keys, and phone chargers from the apartment and give them to Adam. The next day, at the St. Louis Arch (Arch), Kattie gave Adam the gun, which he testified looked like a .22-caliber handgun, and the other items. About a block away from the Arch, Adam threw the gun into the Mississippi River. The gun was never recovered. A few days later, Adam drove Jordan and the defendant to a fishing shack in Arnold, Missouri, where they were going to hide out. Shortly thereafter, Jordan and the defendant were arrested at that location.

Paula's body was discovered behind a Rent-A-Center store in Belleville, Illinois, on July 6, 2005. The pathologist, Dr. Raj Nanduri, testified that Paula died from a gunshot wound from a small bullet to the back of her head. Paula's body was badly decomposed, but Dr. Nanduri determined that she had been shot only once and that she was bruised on her right upper arm, right forearm, left leg, and left hand. She had a broken bone in her hand and scratches on her right foot and right leg. The grass pattern on her left thigh and leg indicated that she had lain in the grass for several days before she was discovered.

The defendant concentrated his defense on impeaching Jordan's truthfulness so that the jury would believe that Jordan, not the defendant, shot Paula without any prior warning. The defendant cross-examined Jordan at great length, challenging his memory and pointing

4

out the flaws in his statement, particularly that it was not reasonable to believe that Jordan had not been involved in Paula's murder even though, after the murder, he had handled the murder weapon, used it to crack the windshield on her car, thrown her belongings out of the car, attempted to conceal her murder, and told Chad Chappie to lie about his whereabouts. The defendant also challenged Jordan's statement that he had never been at the Rent-A-Center where Paula's body was discovered. The defendant questioned Jordan about the favorable deal he had negotiated with the State, which freed him from any criminal charges for Paula's murder or the concealment of that murder and allowed him to plead guilty to the lesser offense of obstruction of justice.

The defendant also called an expert witness to testify about the dynamics of a close-range gunshot wound to the head. The expert witness testified that if Jordan was the one who had shot Paula, the spray pattern from that wound would explain the mysterious white, cakelike substance on Jordan's pants and the lack of any blood spatter on the center part of Paula's back. The defendant urged the jury to believe that Jordan had placed one knee on Paula's back and shot her in the back of her head at close range, causing both the white substance on his pants and the lack of blood spatter on her back. Since there was no evidence that the defendant had any similar substance on his clothing, he argued that the jury should not believe that he shot Paula but that Jordan did.

At the close of all of the evidence, the State voluntarily dismissed the concealment charge, and the jury began its deliberations at 11:07 a.m. At 1:15 p.m., the jury sent out two notes, both of which asked questions about the evidence. The parties discussed what, if any, answers the court should give, and the court eventually responded with notes to which both sides agreed. At 3:05 p.m., the jury sent out another note, saying: "We are in a deadlock. What do we do [now]?" The court and the prosecuting attorney both wanted to instruct the jury to continue deliberating, but defense counsel requested that the court "talk to the

5

foreperson" to inquire "whether or not they are so widely divergent in their views that they feel that no further deliberations would change people's minds." The court and the attorneys all agreed that it was unusual for the jury to become deadlocked so early in the deliberations.

The trial judge brought the jury foreperson[1] into his chambers and told her that they had received the jury's note about being deadlocked. The judge told her that she should not tell them anything about the nature of the vote. The following colloquy ensued:

"THE COURT: Why do you think that there is absolutely no ability for the jury to reach a verdict?

[Foreperson:] Well, of course, there's [*sic*] two sides, and one of the sides–well, both sides have said ['][T]his is what we believe[;] we're not changing our opinion[;] no matter what you say, you're not changing it.['] It was said that [']I'm not discussing this anymore[;] I'm not defending myself anymore[;] I have my opinion and that's it.[']

THE COURT: Is the– Is the debate still intellectual or has it gotten personal?

[Foreperson:] Way beyond intellectual.

THE COURT: Are people still talking to each other?

* * *

[Foreperson:] No.

* * *

MR. (Clyde) KUEHN [defense counsel]: Mrs. [Foreperson], at this point if you return to the jury and say ['][W]e're supposed to continue to deliberate,['] do–is it your opinion that the jurors will openly discuss evidence instead of personalities and prejudgment?

_____

[1]We refer to the jurors by designations other than their actual names in order to protect their privacy.

6

* * *

[Foreperson:] I believe that we will stare at the wall and wait until you've said we've been in there long enough."

The judge asked the foreperson to wait outside of his chambers while he discussed the situation with the attorneys. The court then brought her back into chambers and instructed her that, because the trial had lasted 3½ days, "both parties deserve a little more deliberation." He requested that she ask the jurors to go over the evidence and the witnesses' testimony again. The foreperson asked the judge and the attorneys how she should "deal with someone saying [']I'm not discussing this anymore.['] " The prosecuting attorney suggested that she might say that if anyone did not want to discuss the evidence, he or she could simply listen to the others. The foreperson went back to the jury, and the deliberations continued.

At 6:10 p.m., the jury sent out additional notes inquiring about the evidence. The attorneys again discussed with the court what responses, if any, they should give the jury. Defense counsel stated, *inter alia*, as follows:

"MR. (Justin) KUEHN: Our position is that we have a jury here that represented to us that they were hopelessly deadlocked. It's clear they're trying to resolve their differences. We think they should get the transcripts [that they requested]."

The court agreed with the prosecuting attorneys that no transcripts would be sent to the jury.

At 6:45 p.m., the jury sent out another note, which stated: "We have made no progress. The vote is exactly the same." Defense counsel responded, in part, as follows:

"MR. (Justin) KUEHN: This case does need to be mistried. It was– I think it should have been mistried when the [foreperson] came in here and testified as she did ***. *** I believe the jury is at an impasse between those people who believe the burden of proof is most important versus the people who think that justice for the

7

Paula Weinmann family is important. I don't think there is going to be any movement."

The court called the jury back into the courtroom and inquired of the foreperson to determine if further deliberations were possible. The foreperson told the court that the jury remained at a standstill. The following colloquy then occurred:

"THE COURT: Do you believe that there is–if negotiations were to continue, do you believe that there is any possibility that educated discussion of the issues before the jury would lead anybody to change their mind?

[Foreperson:] Zero percent chance.

THE COURT: Do you believe that continued negotiations would be done with an open mind with at least the opportunity to change positions?

[Foreperson:] No.

THE COURT: Does anybody in the jury disagree with her reports? If you do, raise your hand?

(No response)

THE COURT: Mr. Rhein [prosecuting attorney], do you wish any questions?

MR. RHEIN: Yes, your Honor. Ms. Foreperson, when we talked to you at 3:15 [p.m.], you had indicated that some people did not want to discuss further issues in the case, and I had broached the topic in chambers with you as to whether or not you could tell those people to listen. Did that occur, because you apparently did deliberate for about four more hours?

* * *

[Foreperson:] They listened and looked at the evidence that we have available for us to look at, uh-huh.

MR. RHEIN: And do you regard that as deliberation?

8

[Foreperson:] With no intent to change their mind."

The court asked the defendant's attorneys if they had any questions, and one of them responded, "No, I think everything that needs to be said has been said." The judge told the jurors that he agreed that they were deadlocked. He then declared a mistrial and discharged the jury. After the jury left, the court discussed possible dates for the next trial, and the prosecution and the defense agreed on a date for a status hearing.

On September 7, 2006, the defendant filed a "Former Jeopardy Motion to Bar Further Prosecution," pursuant to the Illinois constitutional guarantees of a trial before an impartial jury and prohibiting former jeopardy (Ill. Const. 1970, art. I, §§8, 10) and section 3-4 of the Criminal Code, which provides, in pertinent part, as follows:

"(a) A prosecution is barred if the defendant was formerly prosecuted for the same offense, based upon the same facts, if such former prosecution:

* * *

(3) Was terminated improperly after the jury was impaneled and sworn *** but before findings were rendered by the trier of facts ***." 720 ILCS 5/3-4(a)(3) (West 2004).

The defendant based his motion on the theory that two of the jurors had "redefined their duty as jurors" and "defiantly refused to debate the evidence under the legal standards at issue, corrupted the process to verdict, and deprived the defendant of his constitutional right to a trial at which his guilt or innocence would be decided by twelve fair and impartial jurors."

On September 13, 2006, the defendant filed an amended motion to bar further prosecution, alleging that the juror misconduct that occurred after the jury had been charged should bar a retrial in the same way that prosecutorial misconduct designed to provoke a mistrial bars a retrial, and the defendant cited *People v. Brisbon*, 129 Ill. 2d 200, 220-21, 544 N.E.2d 297, 306 (1989). The defendant alleged that one of the jurors had announced to the

9

others that she did not believe that the State had proved the defendant's guilt beyond a reasonable doubt but that she still would not vote for an acquittal. Another juror allegedly refused to vote to acquit, asserting that the police and the prosecuting attorneys worked for the public and that the jurors should be on their side. The defendant alleged that the misconduct of these two jurors demonstrated a reasonable probability of a favorable outcome sufficient to overcome the State's right to retry him and that the State "should not benefit from a fraud that two unfair and biased jurors interjected into the trial process."

At the hearing on the defendant's motion, the State moved "to dismiss" on the basis that the defendant had no right to present evidence on the nature of the jury's deliberations without some showing that those deliberations were improperly tainted from a source outside the jury room. The trial court took the State's motion under advisement and allowed the defendant to present testimony as an offer of proof in support of his motion.

The jury foreperson testified that she thought the jury's initial vote was split seven to five in favor of conviction. After the jurors stated their rationales for their respective votes, the jury voted again, this time voting 10 to 2 in favor of acquittal. The foreperson testified that she felt that the 10 jurors who voted to acquit the defendant did so because they felt that the State had not proved its case. She testified that one of the jurors who had voted to convict "said that the prosecution was not itself, that they did a poor job in presenting their case, that they were unorganized[,] and that was unlike them." The foreperson testified that "about five hours into the deliberations," the juror told the others that she would not explain her vote, that she did not have to defend herself, that she did not think the prosecution proved its case, that she could not vote to acquit, and that she would not change her vote.

The foreperson testified that the other juror who voted to convict had "made very little logical sense" because he explained his vote based upon his feeling that the prosecution and the police worked for them and that they should, therefore, side with the State. The

10

foreperson testified that she and the other jurors were very concerned that if they found the defendant not guilty, he might not be tried again. She testified that they did not want the defendant "on the street." The foreperson testified that she thought the State had made a mistake by dismissing the concealment charge because she thought the jury would have voted unanimously to convict him of that charge.

A second juror,[2] Mr. Smith, testified that he thought the jury's first vote was "split right down the middle." Mr. Smith testified that the jury talked about the evidence for about an hour before taking a second vote, at which time more jurors voted in favor of acquittal. He recalled that a female juror voted for conviction. He agreed with defense counsel that some of her comments seemed inconsistent with her oath. He explained that he thought she was voting improperly because "[the jurors were] supposed to base everything off of facts and not emotions or anything like that, and one of her statements was ['][I]f this guy cheated on his girlfriend, he obviously did it.['] " He testified that she made her opinion clear "pretty much right after the first *** vote," telling the other jurors that they "may as well get comfortable" because they were going to be there all night "if that's what it took." Mr. Smith testified that the juror had made up her mind how she was going to vote and that she stood her ground, which was her prerogative.

The State called a third juror, Mrs. Jones, who testified that after the first vote, the jurors all stated their reasons for their votes, and one of the jurors who had voted to convict said she did so because the defendant owned the weapon and had sex with the victim. Mrs. Jones testified that the juror said that she was going to be a deadlocked juror because she was not willing to change her mind but that she continued to deliberate with the others even though she was not happy about it. Mrs. Jones testified that the other juror who voted to convict said that he had voted that way because the defendant took a right turn out of PT's

---

[2] We refer to the two additional jurors who testified as "Mr. Smith" and "Mrs. Jones."

11

parking lot. She thought that juror firmly believed that the defendant was guilty. She testified that both of the jurors who voted to convict spoke with the other jurors and listened to what they said. She did not recall the female juror saying anything about the State not proving the defendant guilty but recalled that more than once the female juror stated her reasons for believing that he was guilty.

After the attorneys argued their respective positions, the court entered a written order, granting the State's motion "to dismiss" and finding, in relevant part, as follows:

"Case law states that jurors['] verdicts are not to be impeached, [and] the exception to this rule is for proof of extraneous influences on the jury. The motion of the defendant does not suggest outside influences affected the jury, but that preconceived beliefs held by individual jurors did.

This ruling moots further need to rule on the merits, but since the testimony was taken I will comment. If a ruling on the merits was needed I would deny that motion. *** The defense presented testimony of jurors that had their minds set on a desired verdict, but not jurors who were affected by outside influences. There was testimony of deliberation and reasons for positions. These were not responses the defense wanted [but] I can not agree that they reach a due process violation."

The defendant filed a motion to reconsider, which the court granted on October 31, 2006. In its written order, the court denied the defendant's motion to bar further prosecution, rather than granting the State's motion "to dismiss," but the court reaffirmed its earlier findings and added as follows:

"I note that the State presented testimony contradicting the defense testimony. I also find that the activity of the jury did not violate the defendant's right to a trial by jury."

The defendant filed a timely notice of appeal from the order of October 31, 2006.

ANALYSIS

12

The defendant's argument on appeal is based upon his assertion that the evidence presented at the trial and the motion hearing unequivocally showed that a juror arbitrarily refused to vote not guilty even though she believed that the State did not prove its case. While there is some evidence in support of the defendant's version of the evidence, that evidence is hearsay, equivocal, and contradicted. The only fact that is truly clear from the record is that 2 of the 12 jurors voted to convict. The defendant correctly notes that one juror was adamant in her refusal to vote for acquittal.

However, he also claims that the juror acknowledged that the State did not prove its case. The hearsay evidence presented on that issue is equivocal at best: The foreperson testified that a juror told the others that she did not think the prosecution proved its case; Mr. Smith testified that the juror made up her mind that the defendant was guilty based upon the evidence that he owned the murder weapon and had sex with the victim; and Mrs. Jones testified that the juror said nothing about the State not proving its case but that the juror had voted to convict because the defendant owned the murder weapon and had sex with the victim.

The defendant also claims that the trial court "expressly found" the foreperson's testimony regarding the female juror's conduct during deliberations to be credible. That claim is only partially correct. The trial court actually stated that it believed that *all* of the testifying jurors "were being honest," noting in its October 31, 2006, order that the State had presented evidence "contradicting the defense testimony." Accordingly, we cannot agree with the defendant's conclusion that "there is no dispute that a juror voted for an outcome that departed from her declared view of the evidence."

Nevertheless, even if the evidence were as conclusive as the defendant claims, that would not be sufficient to reverse the trial court's order because there is no evidence of an outside influence improperly affecting the jury. A "near-universal and firmly established

13

common-law rule in the United States" has long prohibited the admission of juror testimony to impeach a jury verdict. *Tanner v. United States*, 483 U.S. 107, 117, 97 L. Ed. 2d 90, 104, 107 S. Ct. 2739, 2745 (1987). Exceptions to the common-law rule are recognized only in situations in which a party alleges that an extraneous influence affected the jury. *Tanner*, 483 U.S. at 117, 97 L. Ed. 2d at 104, 107 S. Ct. at 2746. In *Tanner*, the Court listed examples of influences that do not constitute extraneous influences, such as a juror's inability to hear, comprehend, or understand the English language; psychological disorders; and mental incompetence. *Tanner*, 483 U.S. at 118-19, 97 L. Ed. 2d at 104-05, 107 S. Ct. at 2746-47.

Our courts have long recognized the strong rationale against any examination of the jury deliberation process except when there has been a truly extraneous influence. If a jury verdict can be set aside on the testimony of jurors about their deliberations, then:

> " 'all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation–to the destruction of all frankness and freedom of discussion and conference.' " *Tanner*, 483 U.S. at 119-20, 97 L. Ed. 2d at 106, 107 S. Ct. at 2747 (quoting *McDonald v. Pless*, 238 U.S. 264, 267-68, 59 L. Ed. 1300, 1302, 35 S. Ct. 783, 784 (1915)).

The defendant contends that the "Illinois legislature has provided a means by which to address the circumstances that transpired in the trial of this case." He argues that section 3-4(a)(3) of the Criminal Code, which prohibits retrials when the first trial "[w]as terminated improperly after the jury was impaneled and sworn *** but before findings were rendered by the trier of facts" (720 ILCS 5/3-4(a)(3) (West 2004)), protects him from a retrial because

one of the jurors in his case effectively sabotaged meaningful deliberation to a verdict. The defendant argues, "Any trial terminated without a verdict because a juror insists upon a verdict of guilt, despite acknowledged concurrence with other jurors that the State failed to prove guilt beyond a reasonable doubt, has been terminated improperly." We have already explained why we reject the defendant's assessment of the evidence, and we now also reject his conclusion that the trial court's declaration of a mistrial amounted to an "improper termination" of the trial under the statute.

Without some evidence that an improper outside influence tainted the jury, the trial court had no basis upon which to receive evidence about the jury deliberation process. See *People v. Pitsonbarger*, 205 Ill. 2d 444, 468-69, 793 N.E.2d 609, 626 (2002) (a jury's verdict is not subject to impeachment by the testimony of the jurors unless the testimony is offered as proof of "improper extraneous influences on the jury"). We understand the defendant's argument that the circumstances below, in which the jury failed to reach a verdict, are different from cases in which a party seeks to impeach a verdict. However, we do not agree that the public policy prohibiting an examination of jury deliberations is any different simply because this jury did not reach a verdict.

The public policy in favor of keeping jury deliberations private so that jurors will feel free to openly and frankly discuss the evidence is no less important when the jury is deadlocked than when it has reached a verdict. Certainly, if deadlocked jurors thought that their mental processes and every word they said during deliberations could be scrutinized and made public, some would avoid saying anything and others might carefully monitor what they said, which would bind the jury in its search for the truth and erode our trust in the reliability of verdicts. The defendant's premise, that a single juror's refusal to deliberate or vote to acquit even though she did not believe the State had proved its case, while not supported by the record in our case, does not provide him with a reason to explore the jury

15

deliberations even if it were true. The question is not *why* the jury could not reach a verdict, but whether the jury was truly deadlocked with no hope of reaching a verdict, because a hopelessly deadlocked jury creates a manifest necessity for the court to declare a mistrial and discharge the jury so that another jury *can* reach a verdict.

" 'Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.' " *Illinois v. Somerville*, 410 U.S. 458, 462, 35 L. Ed. 2d 425, 430, 93 S. Ct. 1066, 1069 (1973) (quoting *Gori v. United States*, 367 U.S. 364, 368, 6 L. Ed. 2d 901, 904, 81 S. Ct. 1523, 1526 (1961)).

In *Somerville*, the Court noted that a criminal defendant may be retried after the court has declared a mistrial if that declaration was a manifest necessity. *Somerville*, 410 U.S. at 467-68, 35 L. Ed. 2d at 433, 93 S. Ct. at 1072. The myriad unforeseeable circumstances in which the completion of the trial is impossible include "the failure of a jury to agree on a verdict." *Somerville*, 410 U.S. at 470, 35 L. Ed. 2d at 434, 93 S. Ct. at 1073.

" 'In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again. And there have been instances where a trial judge has discovered facts during a trial which indicated that one or more members of the jury might be biased against the Government or the defendant. *It is settled that the duty of the judge in this event is to discharge the jury and direct a retrial.* What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.' " (Emphasis added; *Somerville* emphasis omitted.) *Somerville*,

16

410 U.S. at 470, 35 L. Ed. 2d at 434, 93 S. Ct. at 1073 (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 93 L. Ed. 974, 978, 69 S. Ct. 834, 837 (1949)).

The factual scenario envisioned by the Court in *Somerville* is essentially the same as the defendant postulates here. The defendant argues that, before the deliberations began, one of the jurors on his panel made up her mind that she would not acquit even though she did not believe that the State had proved its case. Even if the evidence supported that argument, we would still find that the juror's conduct indicates a prejudice against the defendant no different from that described in *Somerville*. *Somerville*, 410 U.S. at 470, 35 L. Ed. 2d at 434, 93 S. Ct. at 1073. Thus, the trial court accepted its responsibility, properly declared a mistrial, and discharged the jury. In our case, the defendant's right to have his trial completed by the first jury is subordinate to the public's interest in a complete and just resolution of the charges against him at a retrial.

The defendant also attempts to analogize the juror's conduct in this case to cases in which prosecutorial misconduct or judicial overreaching causes a premature termination of the trial before a verdict. He notes that deliberate governmental misconduct, which is calculated to deprive a defendant of his right to a fair trial, bars a retrial. See *United States v. Dinitz*, 424 U.S. 600, 611, 47 L. Ed. 2d 267, 276, 96 S. Ct. 1075, 1081 (1976). Prosecutorial misconduct or judicial overreaching, each of which involves calculated misconduct rather than mere error, is not an inevitable part of a trial and cannot be condoned, because it signals a breakdown in the integrity of the trial. *People v. Pendleton*, 75 Ill. App. 3d 580, 594, 394 N.E.2d 496, 506 (1979). The defendant contends that the facts of our case are the same, asking, "[W]hat could be worse than a juror who refuses to meaningfully participate in juror deliberation to verdict?" We disagree. Juror misconduct of the sort that the defendant claims occurred below is not similar in any manner to the sort of intentional governmental overreaching that bars a retrial.

Nothing about the facts of the case below, even the defendant's version of those facts, is even vaguely similar to the kind of prosecutorial misconduct or judicial overreaching considered in *Pendleton* or any other case to which the defendant cites. The defendant acknowledges that, typically, prosecutorial misconduct that triggers the protection of section 3-4(a)(3) so that a retrial is barred "is misconduct designed to provoke or cause a mistrial in order to obtain a second, more favorable, opportunity to convict the defendant." He claims that the juror misconduct in our case is the same. Clearly, it is not, nor could it be.

First, the prosecution is a party to the case. The jury is an independent fact finder and not a party to the case. Second, the prosecution and the judge are public officials acting on behalf of the state. The jurors are common citizens, peers of the defendant, not state actors. Third, the conduct of our prosecutors and judges is governed by statute, case law, rules of ethics, and public opinion. Jury deliberations are private and not to be examined unless some outside influence has improperly spoiled them. *Tanner*, 483 U.S. at 127, 97 L. Ed. 2d at 110, 107 S. Ct. at 2751 ("long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry" except for improper extraneous influences).

## CONCLUSION

For all of these reasons, we hold that the trial court did not err in denying, upon reconsideration, the defendant's motion to bar a retrial. Neither constitutional provisions nor statutory provisions bar a retrial under the circumstances of this case.

Affirmed; cause remanded.

WELCH and SPOMER, JJ., concur.

NO. 5-06-0588

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 05-CF-1094 |
| | ) | |
| JON E. CEARLOCK, | ) | Honorable |
| | ) | John Baricevic, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Opinion Filed**:       April 29, 2008

**Justices**:       Honorable Bruce D. Stewart, P.J.

Honorable Thomas M. Welch, J., and
Honorable Stephen L. Spomer,
Concur

**Attorney** Clyde L. Kuehn, The Kuehn Law Firm, 23 Public Square, Suite 450, Belleville, IL
**for** 62220
**Appellant**

**Attorneys** Hon. Robert Haida, St. Clair County State's Attorney, 10 Public Square, Belleville,
**for** IL 62220; Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Patrick
**Appellee** D. Daly, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730
East Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864