Filed 10/17/23  P. v. Hill CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL HILL,<br><br>Defendant and Appellant. | B322169<br><br>(Los Angeles County Super. Ct. No. TA152029) |

APPEAL from an order of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Spolin Law, Aaron Spolin and Jeremy M. Cutcher, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant Michael Hill (defendant) of attempted murder and several other offenses for shooting his girlfriend.  We are asked to decide whether defendant's trial attorney was constitutionally ineffective because she herself made reference to (and did not object to other references to) the fact that he was held in custody during trial.  We also consider whether the use of face masks during part of defendant's trial—to reduce the risk of contracting COVID-19—violated his constitutional rights.

## I.  BACKGROUND
### A.     *The Offense Conduct, as Established by the Evidence at Trial*

Around 9:30 a.m. on March 5, 2020, Harold Hathorn (Hathorn) was sitting in a van with a friend.  They were parked on the street outside their church in Lynwood preparing to "go from door-to-door [to] conduct Bible studies."  Defendant lived nearby, and Hathorn occasionally stopped by defendant's home to discuss religion with him.  Hathorn had known defendant for several months.

Hathorn noticed a woman walking on the sidewalk and defendant "walking behind her in a hurry."  The woman, Naketia Gregory (Gregory),[1] was unknown to Hathorn.  Defendant was speaking angrily in a raised voice and pulled a gun from his

---

[1]     The appellate record includes some references to Gregory in which her first name is spelled "Nakita," but she spelled her name "Naketia" when she testified at defendant's sentencing hearing.  Defendant refers to Gregory as "Mrs. Hill" in his opening brief, but the appellate record does not establish defendant and Gregory are married.

2

waistband as he approached the woman. Defendant walked in front of Gregory "and they had some type of verbal altercation," but Hathorn could not make out what they said.

Hathorn saw defendant point the gun at Gregory and "got the feeling that it appeared he was going to shoot her." Hathorn said, "Michael, don't do it," but defendant did not respond. Defendant then shot Gregory and fled the scene.

Hathorn drove Gregory to a hospital. She was treated by Dr. Almaas Shaikh, a trauma critical care surgeon. Dr. Shaikh testified Gregory suffered "injuries to her intestinal tracts in various places" and had to have a portion of her colon removed. Dr. Shaikh testified Gregory's injuries would have been fatal without immediate medical and surgical attention.

After the shooting, Los Angeles County Sheriff's Department (LASD) deputy Christian Medina recovered surveillance video from a nearby business that showed defendant tossing something into a bush a few feet from where the shooting occurred.[2] Deputy Medina located a revolver in the bush and inside were three bullets and one spent casing.[3]

---

[2] The video was played at trial.

[3] LASD criminalist Tracy Peck examined the gun, a Smith & Wesson .357 revolver, and testified it was undamaged and in working order. Peck opined that the gun could not have fired without someone pulling the trigger and testified regarding the amount of pressure required to do so. Defendant's firearms expert, David Kim, testified that the trigger required less pressure than called for in factory specifications and discussed his experience with accidental discharges as a firearms instructor.

LASD detective Keegan McInnis distributed "wanted" flyers for defendant to surrounding law enforcement agencies. When defendant was arrested in Norwalk about two months after the shooting, in May 2020, Detective McInnis read defendant his Miranda rights and interviewed him at an LASD station. The interview was recorded and the audio was played at defendant's later criminal trial.

Defendant told Detective McInnis that Gregory was his "off and on" girlfriend. About a week prior to the shooting, defendant heard from a mutual acquaintance that Gregory planned to have someone rob him. Defendant bought the gun to protect himself. When defendant saw Gregory on the morning of the shooting, he "confronted her" and pulled the gun "to scare her." He heard Hathorn tell him not to shoot, "[b]ut [he] was not thinking. [He was] thinking about [how Gregory was] trying to get somebody to do something to [him] . . . ."

Defendant still claimed, however, that the shooting was unintentional. He said that he and Gregory reconciled during the two-month period between the shooting and his arrest. They went to Las Vegas and "tried to get married, but everything . . . [was] shut down" due to COVID-19.

Asked to explain why he did not remain on the scene to help Gregory, defendant told Detective McInnis that he saw Hathorn helping her, he believed she had been hit in the shoulder,[4] he was "just frustrated and mad," and he "panicked." Asked to explain why he did not subsequently contact law

_____

[4]     It was stipulated at trial that defendant, who represented himself at his preliminary hearing, stated at that hearing that he "shot [Gregory] in the upper torso."

4

enforcement to explain the shooting was an accident, defendant said he initially planned to turn himself in, post bail, and "fight [his case] from the streets." When he spoke to a bail bond agent, however, and learned his bail would likely be far more than he could afford, he decided not to turn himself in.

At trial, defendant testified during the defense case and expanded upon his post-arrest interview statements to Detective McInnis. He testified he had known Gregory for ten years and they had been engaged for five years, though he had been "incarcerated for two of them." They continued to talk every day, however. Defendant bought the gun about a week prior to the shooting because he had "just c[o]me into a little inheritance from [his] father, and [he] heard rumors somebody [was] going to rob [him] and beat [him] up . . . ." He and Gregory were living together at the time of the shooting, but he stayed at a motel the night before because he and Gregory "had some words." On the morning of the shooting, defendant was "hanging out with the fellas drinking beer" outside a shop near the apartment he shared with Gregory. Defendant saw Gregory walk outside and approached to ask whether "anybody was trying to rob [him] or jump [him]. [Gregory] said no, not that [she] kn[e]w of, and [defendant] pulled the gun out of [his] right-hand pocket, and said, well, [']I bought this.['] [Gregory] said, [']you know I don't like guns,['] and [Hathorn] said, [']don't do it, ain't worth it.['] . . . [Defendant] went back and . . . tried to put [the gun] in [his] pocket and the gun went off."[5] Defendant was "in shock" and "threw [the gun] in some bushes" as he walked away.

_____

[5] One aspect of defendant's defense was that his height relative to Gregory's was consistent with the gun discharging as he placed it in his pocket. Defendant's sister testified he is six

5

It was stipulated at trial that defendant had previously been convicted of a felony making it unlawful for him to possess a firearm under Penal Code section 29800, subdivision (a)(1).[6]

### B. *Verdict and Sentencing*

The jury found defendant guilty of attempted willful, deliberate, and premeditated murder (§§ 664, subd. (a), 187, subd. (a)) (count one); injuring a spouse, cohabitant, fiancée, or girlfriend (§ 273.5, subd. (a)) (count two); assault with a firearm (§ 245, subd. (a)(2)) (count three); and possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count four). In connection with the attempted murder conviction on count one, the jury found true allegations that defendant personally and intentionally discharged a handgun causing great bodily injury within the meaning of section 12022.53, subdivisions (b)-(d). As to counts one through three, the jury found true allegations that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a) and personally inflicted great bodily injury under circumstances involving domestic violence within the meaning of section 12022.7, subdivision (e).

The trial court sentenced defendant to life in prison for attempted murder with a minimum parole eligibility of seven years, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement. The trial court sentenced defendant to a concurrent term of 16 months for possession of a firearm by a

---

feet, two inches tall, and a defense investigator testified Gregory is five feet, four inches tall.

[6] Undesignated statutory references that follow are to the Penal Code.

felon. The trial court did not orally pronounce a sentence on counts two and three, but indicated "the enhancements are stayed pursuant to [section] 654." A minute order for the sentencing hearing reflects sentences of two years in state prison on counts two and three.

## II. DISCUSSION

Defendant contends he received ineffective assistance of counsel because his trial attorney made references to the fact that he was incarcerated during trial and did not object to other such references. It is well established, however, that there may be tactical reasons for allowing jurors to learn that a defendant is in custody. That is the case here, which means reversal is unwarranted. In addition to appealing to the jurors' sympathy, defendant's incarceration provided essential context for the fact that he and Gregory were still in a relationship and she (presumably) believed the shooting was unintentional.

Defendant also contends the requirement that he, his attorney, witnesses, and the jury wear masks during the first part of his trial, held in March and April 2022, violated his constitutional rights of confrontation and to an impartial jury. The argument fails. California courts have published several opinions, which we shall follow, that persuasively reject contentions that the use of a partial face covering during the extenuating circumstances of the COVID-19 pandemic is grounds for reversal.

We shall accordingly affirm defendant's convictions, but we will remand the cause for resentencing to correct an easily remedied error.

> A. *Defendant Has Not Established Ineffective Assistance of Counsel on Appeal Because There Are Tactical Reasons Why the Defense Might Want the Jury to Know Defendant Was in Custody*
>
> > 1. *Additional background*

There were several references to defendant's in-custody status at trial. First, in the recording of defendant's interview with law enforcement, defendant expressed concern that jail records would reflect that he had a substantial amount of money in his possession at the time of his arrest. Defendant said he wanted to "make sure [he had] some money on [his] books," and Detective McInnis testified this reflected defendant's concern that "while he's in the LA County Jail system, he can purchase food, snacks, and other things from the commissary."

The topic came up again during defense counsel's examination of the defense investigator, Bernadette Gambino (Gambino). Asked to explain how she assisted defendant when he was in propria persona, Gambino testified "the time that [she] spent with [defendant] was basically visiting him at men's central jail, which is where he was at the time. And then spending the time going over all the discovery, everything that he gets from the [prosecution] . . . ."

Later, as we have already mentioned, defendant testified he had known Gregory for ten years and they had been engaged for five years, though he had "been incarcerated for two of them." Defendant also testified that Gregory sent him a photograph of herself while he was in jail.

Finally, defendant's attorney briefly referred to defendant's incarceration during her closing argument. Displaying a photograph of defendant, counsel commented, "This is

8

[defendant], 6-foot-2.  This picture was the picture that was authenticated by [defendant's] sister at the very beginning when he said he was 6-foot-2.  But we also had [defendant] state that he was 6-foot-2 as well, and he was, I believe, 200 pounds . . . before he put on some jail weight."

When charging the jury, the trial court gave CALJIC 2.29 because "[defendant] ha[d] testified that he[ was] in custody."  The instruction stated that "[t]he mere fact that the defendant is in custody must not prejudice you for or against any party.  [¶] You are not to consider the fact that defendant is in custody for any purpose.  In your deliberation, do not discuss or consider that fact.  That fact must not in any way affect your verdict."

### 2. *Analysis*

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 694[ ]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [ ].)'"  (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)  We presume "'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  [Citations.]'" (*Ibid.*; see also *People v. Scott* (1997) 15 Cal.4th 1188, 1212 [a reviewing court "should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight"].)  "'If the record on appeal sheds no

light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' [Citation.]" (*Carter*, *supra*, at 1189; accord *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission"].)

"It is established that a court may not require a defendant to attend trial wearing jail clothing, because such a requirement would impair the presumption that a defendant is innocent unless and until proved guilty beyond a reasonable doubt. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1335-1336; accord *Estelle v. Williams* (1976) 425 U.S. 501, 503-506; *People v. Taylor* (1982) 31 Cal.3d 488, 494-495.) Our Supreme Court has suggested that "[i]t may be inferred that other information, having the same tendency to remind the jury that a defendant is in custody, might have a similar effect." (*Bradford*, *supra*, at 1336.) Although defendant appeared in civilian clothing at trial, he argues the references to his custody status during trial undermined the presumption of innocence.

Defendant's argument that his trial attorney was constitutionally ineffective for making reference to his custody status during trial (and not objecting to references to that status by others) fails because we cannot say there can be no rational tactical purpose for the attorney's actions (and inaction). Indeed, there are several plausible reasons to conclude otherwise.[7]

---

[7] In analyzing the issue, we assume just for argument's sake that defendant is correct in believing that references to his

10

First, the Attorney General correctly highlights case law suggesting a defendant might want the jury to know he or she is incarcerated "in the hope of eliciting sympathy." (*Estelle v. Williams*, *supra*, 425 U.S. at 508 ["it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury"].) Because defendant did not dispute that he possessed and fired the gun, his attorney "could not realistically have argued [her] client was innocent of all charges and should not be in custody," and could therefore have made a reasonable tactical calculation that jurors would be more likely to acquit knowing defendant had already spent time in custody as a result of the charged crime. (*Scott*, *supra*, 15 Cal.4th at 1214-1215.)

Second, and beyond appealing to the jury's sympathy, defendant's incarceration provided important context for the fact that he and Gregory were still in a relationship and the related defense theory that this showed the shooting must have been unintentional. During a discussion with the trial court regarding a separate issue, defense counsel expressly argued that defendant's case "really turn[ed] on the fact that [he and Gregory] had a longstanding relationship and continued to see each other, trust was not broken." Defendant could not testify that he was currently living with or going out on dates with Gregory, so he testified that they spoke every day and she sent a photograph to him in jail. Defendant's arrest and incarceration also explained

---

custody status are the functional equivalent of having him appear at trial in jail garb. (But see *People v. Valdez* (2004) 32 Cal.4th 73, 121.)

11

the apparent lack of follow-up after defendant and Gregory tried and failed to get married in Las Vegas after the shooting.

Third, defendant's explanation for not turning himself in after the shooting hinged on his inability to afford bail. The jury could readily infer from such statements that defendant was in custody during trial.

### B. The Use of Face Masks During Part of Defendant's Trial Did Not Violate His Constitutional Rights
#### 1. Additional background

When defendant's trial began on March 15, 2022, everyone over two years of age entering any Los Angeles Superior Court courthouse was required to "wear a face mask over both the nose and the mouth while in public areas of the courthouse, including courtrooms."[8] The trial court occasionally reminded participants of this requirement.

---

[8] On our own motion, we take judicial notice of general order 2021-GEN-023-00, issued by the presiding judge of the Los Angeles County Superior Court on June 24, 2021. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) The general order noted that although health authorities had "recently lifted mask mandates and physical distancing requirements for vaccinated persons in most public spaces," these authorities "acknowledged the right of businesses and entities to retain mask requirements." The general order further emphasized that the court remained subject to COVID-19 Prevention Emergency Temporary Standards adopted by Cal/OSHA. The trial court retained a mask requirement "[t]o continue to protect the health of court users . . . in compliance with federal, state, and local public health guidance."

12

A general order issued by the presiding judge of the Los Angeles County Superior Court on March 25, 2022, provided that masks would no longer be required beginning April 4, 2022, but, "[t]hereafter, use of face coverings in courthouses [would be] strongly recommended."[9] The general order explained this change was precipitated by "Los Angeles County['s] emerge[nce] from the most recent surge in COVID-19 cases and public health authorities relax[ing] mandates. . . ."

At the end of the day on March 30, 2022, the trial judge in this case told the parties and jurors that there would be "a change in Los Angeles County Superior Court's policy effective" when trial resumed on April 4, 2022. "[T]he court is lifting the mask requirement for all persons in the courthouse and the courthouse locations, regardless of any vaccination status. So you are not going to be required to wear face masks anymore. However, you may wear a face mask. No one is going to stop you from doing that if you choose to. That's going to be your choice. . . ." Defendant was testifying at the end of the day on March 30, 2022, and his testimony resumed on April 4, 2022.[10] He was the final witness to testify.

---

[9] On our own motion, we judicially notice general order 2022-GEN-005-00.

[10] At the beginning of defendant's testimony on April 4, 2022, his attorney asked the trial court, "perhaps [defendant] wants to keep his mask on, but does he need to keep his mask on?" The trial court emphasized "no one needs to keep their mask on." The record does not indicate whether defendant ultimately removed his mask.

13

*2. Analysis*

Defendant challenges the masking requirement on various fronts, contending that requiring him, his attorney, witnesses, and the jurors to wear masks violated his constitutional rights of confrontation and to an impartial jury. We are unpersuaded because the fundamental assumption underlying defendant's arguments—that masks materially interfere with the ability to assess credibility and demeanor—lacks merit.

*a. Witnesses*

"The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Maryland v. Craig* (1990) 497 U.S. 836, 844.) This right "includes not only a 'personal examination'" of witnesses, "but also '(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.' [Citation.]" (*Id.* at 845-846.)

"Although the constitutional right of confrontation is important, it is not absolute." (*People v. Wilson* (2021) 11 Cal.5th 259, 290.) Rather, it "'must occasionally give way to considerations of public policy and the necessities of the case.'" (*Craig, supra*, 497 U.S. at 848, quoting *Mattox v. United States*

(1895) 156 U.S. 237, 243.)  This "does not, of course, mean that it may easily be dispensed with," and the high court has emphasized "that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."  (*Id.* at 850.)

California courts have now published several opinions discussing the use of opaque face masks by witnesses in criminal trials in response to COVID-19.  They overwhelmingly hold such mask use does not violate the Confrontation Clause.  (See, e.g., *People v. Edwards* (2022) 76 Cal.App.5th 523, 527; *People v. Lopez* (2022) 75 Cal.App.5th 227, 233-236; *People v. Alvarez* (2022) 75 Cal.App.5th 28, 35-39.)  This wall of authority recognizes the important public policy of reducing the risk of COVID-19 infection to participants in a trial and the community at large.  (*Edwards*, *supra*, at 526; *Lopez*, *supra*, at 233-234; *Alvarez*, *supra*, at 36-37.)  Although the trials in at least two of these cases were held prior to the widespread availability of vaccines (*Edwards*, *supra*, at 525-526; *Lopez*, *supra*, at 230), defendant does not dispute the mask requirement continued to serve an important public purpose in March 2022.

Defendant instead emphasizes the significance of nonverbal communication and suggests (without directly engaging authority like *Edwards*, *Alvarez*, or *Lopez*) that masks "inhibited the jury's ability to examine the behavior, manner, facial expressions, and emotional responses of [his] accusers, which undermined the jury's role in assessing credibility."  We are persuaded, however, by the reasoning in these cases that masks do not "significantly obstruct the jury's ability to assess witness demeanor."  (See, e.g.,

15

*Lopez*, *supra*, 75 Cal.App.5th at 234; *ibid.* ["The jurors could see the witnesses' eyes, hear the tone of their voices, and assess their overall body language"]; *Alvarez*, *supra*, 75 Cal.App.5th at 38 ["Although face masks covered the witnesses' mouths and the lower part of their noses, significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable as was posture, tone of voice, cadence and numerous other aspects of demeanor"].)

### b. *Defendant and his attorney*

Defendant's arguments with respect to his and his attorney's use of face masks likewise turn on the jury's ability to assess demeanor. Relying on case law addressing the effects of medication on a defendant's demeanor (*People v. Gurule* (2002) 28 Cal.4th 557, 598; *Riggins v. Nevada* (1992) 504 U.S. 127, 142-145 (conc. opn. of Kennedy, J.)), defendant contends his mask may have interfered with his ability to demonstrate emotion at trial. But whereas medication may "inhibit[ ] the defendant's *capacity* to react and respond to the proceedings and to demonstrate remorse or compassion" (*Riggins*, *supra*, at 143-144 (conc. opn. of Kennedy, J.), italics added), a mask only limits an observer's view of such expression. Because there is no reason to believe that a defendant's emotional response to testimony is any less effectively conveyed through the eyes and overall body language than is a witness's sincerity, this argument lacks merit for the reasons discussed in *Edwards*, *Alvarez*, and *Lopez*. Defendant's related contention that his attorney's mask "hindered" her ability "to demonstrate emotion to the jury" lacks merit for the same reasons.

16

### c. *The jury*

A criminal defendant has a constitutional right to a fair trial by an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) "An impartial jury is one in which no member has been improperly influenced and every member is capable and willing to decide the case solely on the evidence before it. [Citation.] To effectuate this right, the prospective jurors are subjected to voir dire questioning under oath to uncover any bias, and the selected jurors are sworn to decide the case based on the evidence presented to them and the instructions given by the court. [Citations.]" (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1115.)

Defendant contends prospective jurors' use of face masks during voir dire deprived him of the right to an impartial jury by limiting his ability to exercise peremptory challenges in a "face to face" setting.[11] (*Lewis v. United States* (1892) 146 U.S. 370, 375-376 [reversing judgment where, among other things, the record indicated "the [defendant] was not brought face to face with the jury until after the challenges had been made and the selected jurors were brought into the box to be sworn"].) In *Lewis*, the record suggested the defendant and prospective jurors were not both in the courtroom when he exercised his peremptory challenges. (*Ibid.*) Here, by contrast, defendant was present and able to assess the prospective jurors' "looks and gestures" to some degree. (*Id.* at 376.) The reasoning of *Edwards*, *Lopez*, and

---

[11] Although we find no error, our ability to determine whether defendant was prejudiced by any error impacting voir dire is limited by the absence of pertinent reporter's transcripts. (Cal. Rules of Court, rule 8.320(c)(3) [normal record need not contain "the voir dire examination of jurors"].)

17

*Alvarez* as to the ability to assess witness credibility from the eyes, overall body language, and speech applies with equal force in the context of voir dire.[12]

Defendant alternatively contends that requiring jurors to wear masks during trial hindered his and his attorney's ability to assess their reactions to evidence and argument. Assuming a defendant has a right to observe jurors during trial as opposed to jury selection,[13] this argument fails for the same reason as defendant's other challenges to the mask requirement. (*United*

---

[12]    Federal courts have consistently rejected the argument that requiring prospective jurors to wear masks during voir dire violates a defendant's right to an impartial jury on similar grounds. (See, e.g., *United States v. Trimarco* (E.D. N.Y., Sept. 1, 2020, No. 17-CR-583 (JMA)), 2020 WL 5211051, *5 ["Being able to see jurors' noses and mouths 'is not essential' for assessing credibility because '[d]emeanor consists of more than those two body parts' since it 'includes the language of the entire body'"]; *United States v. Tagliaferro* (S.D. N.Y 2021) 531 F.Supp.3d 844, 851 ["despite the [court's] mask mandate, [the defendant] is still free to examine and assess juror credibility in all critical aspects besides the few concealed by the wearing of a mask"]; *United States v. Ayala-Vieyra* (6th Cir., Jan. 21, 2022, No. 21-1177), 2022 WL 190756, *5 ["Courts have consistently" rejected the argument that "seeing the bottom of the jurors' faces is constitutionally required"].)

[13]    At least one court has held "there is no constitutional right that requires a defendant to see a juror's facial expression or allows him to communicate non-verbally with a juror." (*Trimarco, supra,* 2020 WL 5211051 at 5.) Defendant's reliance on *Gomez v. United States* (1989) 490 U.S. 858 is misplaced in this context because that case only discusses the significance of "gestures and attitudes" during jury selection. (*Id.* at 875.)

*States v. Schwartz* (E.D. Mich., Nov. 12, 2021, No. 19-20451), 2021 WL 5283948, *2 ["All courts that have considered this question so far have universally reached the conclusion that a defendant can still assess a juror's credibility and demeanor *during both voir dire and trial* while the juror is wearing a face mask"], italics added.) Defendant's suggestion that masks might have concealed impairments that would violate his right to a competent jury (*Tanner v. United States* (1987) 483 U.S. 107, 126-127) has no specific basis in the record and there is no reason to believe that detecting such impairment behind a mask is any more problematic than assessing credibility.

C.     *Cumulative Error*

Defendant contends that even if the asserted errors in this case are not prejudicial when considered individually, the cumulative effect of those errors requires reversal of his convictions. Because we have found no error, there is no cumulative error. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1020.)

D.     *The Cause Must be Remanded for Imposition of Sentence on Counts Two and Three*

We invited defendant and the Attorney General to submit supplemental briefs addressing the trial court's failure to orally pronounce a sentence on counts two and three. The Attorney General concedes that the failure to pronounce a sentence on these counts resulted in an unauthorized sentence and defendant argues resentencing is required.

The Attorney General's concession is appropriate. (*People v. El* (2021) 65 Cal.App.5th 963, 967 ["The oral imposition of

19

sentence constitutes the judgment in an action, and the minutes cannot add anything substantive to the oral pronouncement"]; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1466 ["when a trial court determines that section 654 applies to a particular count, the trial court must impose sentence on that count and then stay execution of that sentence"].)  We will accordingly remand for resentencing.  (*People v. Taylor* (1971) 15 Cal.App.3d 349, 353 ["In a case where the court fails to pronounce judgment with respect to counts on which convictions were validly obtained, the Court of Appeal has power to remand for the purpose of pronouncement of a judgment in accordance with the verdict. [Citation.]  When such a mistake is discovered while [the] defendant's appeal is pending, the appellate court should affirm the conviction and remand the case for a proper sentence"].)

## DISPOSITION

Defendant's sentence is reversed and the cause is remanded for resentencing, including imposition of sentence on the convictions in counts two and three.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:


RUBIN, P. J.


MOOR, J.

21